**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Willie LIVINGSTON, Julia Faye Williams and Deborah Lynn Williams, a/k/a Deborah Williams Johns, Defendant-Appellants.**

No. 86–2263.

United States Court of Appeals, Fifth Circuit.

April 24, 1987.

---

Marjorie A. Meyers, Asst. Federal Public Defender, Roland E. Dahlin, II, FPD, Houston, Tex., for Livingston.

Larry D. Dowell, Elton L. Brownshadel, Houston, Tex., for Julia Williams.

Ronnie G. Harrison (court-appointed), Houston, Tex., for Deborah Williams.

Mervyn Hamburg, U.S. Dept. of Justice, Washington, D.C., James R. Gough, Asst. U.S. Atty., Houston, Tex., for U.S.

Before GARZA, WILLIAMS and GARWOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

An eight count indictment charged the appellants with receiving and transporting stolen securities in interstate commerce and with conspiracy, in violation of 18 U.S.C. §§ 2314, 2315, 371, and 2. A jury convicted all defendants on the conspiracy count. Julia Williams was convicted on four substantive counts, Willie Livingston on three, and Deborah Williams on one. The district judge sentenced each defendant to serve concurrent terms.

The defendants complain on appeal that (1) the district court made improper evidentiary rulings regarding the testimony of a government witness, David Collins, (2) the evidence was insufficient to support their convictions, and (3) the prosecutor made improper, prejudicial closing arguments to the jury. Upon review of all the evidence, we reject all three claims and affirm the convictions.

## I. *Facts*

The Hagan Insurance Company had one hundred bearer bonds payable by the City of New York on deposit at RepublicBank, Houston. Each bond was worth $5,000 when it matured on November 1, 1982. In October 1982, RepublicBank prepared to redeem the bonds for Hagan. Republic-Bank sent the bonds to the Chase Manhattan Bank, which planned to present them for redemption to Manufacturers Hanover Trust. Chase received the bonds on October 21. Sometime between October 21 and October 24, Ernest McKane—a bond coupon collection clerk at Chase—stole the bonds.

According to Dennis Muldoon, a Chase investigator who testified at the appellants' trial, New York newspapers and television reported the theft, and the Manhattan District Attorney held a press conference about the stolen bonds. Eventually, McKane was discovered, and Chase recovered 86 of the 100 bonds, 70 of them outside of New York state. The case before us involves twelve of the stolen bonds that authorities recovered in Texas and California.

McKane stole the bonds in late October 1982. What happened to the twelve bonds for twenty months after the theft is a mystery. We know only that by the summer of 1984, they appeared in Houston, Texas, in the appellants' possession.

### a. *The First Bond*

Julia Williams met Sherrell Conway in the spring of 1984. They visited a few times, and Julia told Conway that she sold real estate and cars for a living. In June 1984, Julia reported to Conway that a man named Anthony Sane wanted to buy one of her cars with a bearer bond. Julia asked Conway if she or her sister, Linda Lusk, could cash the bond at a bank. Lusk had an account at Gibraltar Savings with a balance of over $5,000 and agreed to help.

Julia Williams, her sister Deborah Williams, Conway, and her sister Lusk together went to Gibraltar Savings. Deborah waited outside in the car while the other three went inside to cash the bond. Conway testified at the trial that a bank employee examined the bond for about thirty minutes before reporting that it was "okay." Molly Strong, Gibraltar's branch manager, testified that she exchanged the bond for $5,000 because Lusk had more than that in her account. Julia Williams directed the teller, through Lusk, to provide $750 in cash and three cashier's checks: one to Julia Williams for $1,000, another to Julia Williams for $1,250, and one to Anthony Sane, the alleged car buyer, for $2,000. According to Conway, Julia promised to pay her $1,250 for her part in this transaction. Lusk testified that Julia gave her $250.

### b. *Bonds Two and Three*

Samuel Stewart owns an office building in Houston. In August 1984, Julia Williams rented the second floor of the building, giving Stewart one bearer bond for the rent. Julia divided the floor into five offices for five companies: J & F Financial Investors; J & F Answering Services; J & F Property Management; R.W. Marketing; and Community Investors Group. She told Stewart that she received the bond from "Yusef Israel" as payment for real estate. Stewart deposited the bond in his account at First City Bank, where it "cleared" after three or four weeks. Stewart then kept about $1,160 for the first month's rent and refunded $3,840 to Julia—part in cash and part in a cashier's check to Yusef Israel.

In October, Julia gave Stewart another bond for the second month's rent, which he also deposited at First City. This time, however, First City discovered that both bonds had been stolen. It charged $5,000 to Stewart's account for the first bond, refused to credit Stewart for the second bond, and returned both bonds to Stewart. When Stewart told Julia that the bonds were stolen, she promised to pay Stewart the $5,000 from the first bond plus the second month's rent, or a total of about $6,140. She also asked him for the bonds, allegedly so she could return them to Yusef Israel. Stewart returned the bonds to Julia, and Julia eventually paid Stewart $2,000 and abandoned the office space.

The two bonds that Stewart returned to Julia soon made their way to Julia's sister, Deborah, who also lived in Houston. David Collins, who lived in California, was Deborah's "ex-boyfriend." Collins testified at trial that he sometimes helped Deborah pay her bills after she moved to Houston. According to Collins, Deborah offered him $3,000 to cash the two bonds that Stewart returned to Julia. In December 1984, Deborah mailed the bonds to Collins in California, and he deposited them in the Security Pacific National Bank, which soon told him that they were stolen.

Collins testified that after he had told Deborah that the bonds were stolen she had asked him to conceal his source of the bonds. First, Deborah told Collins to tell anyone who asked that he bought them from a stranger in Reno, Nevada. The F.B.I. interviewed Collins, and he described the alleged Reno seller. When the F.B.I. challenged this story, Collins admitted that Deborah sent him the bonds. Shortly after Collins' interview with the F.B.I., Deborah called and urged Collins to invent a different story to exculpate the Williams sisters. In response, Collins wrote a letter "To Whom It May Concern," stating that he got the bonds, not from Deborah, but from "Livingstone or Livingstan," and that he mistakenly had implicated Deborah while under the influence of drugs.

At trial, Collins explained all three versions—the Reno seller, Deborah, and "Livingstone or Livingstan"—and insisted that he really did get the bonds from Deborah.

### c. *Bonds 4–10*

As set out above, Julia Williams had rented the second floor of Samuel Stewart's building and split it among five companies. Willie Livingston, an insurance salesman, managed one of these companies—the Community Investors Group. Livingston shared a house with a man named Larry Creswell, who eventually cashed seven of the stolen bonds. At trial, Creswell explained how he got involved with the bonds.

In October 1984, Livingston introduced Creswell to Julia Williams. Julia asked Creswell to open two bank accounts with some of the bonds, and Creswell agreed. Creswell approached the "Sharpstown" and "Fondren Southwest" branches of the Gibraltar Savings Association. Gibraltar required Creswell to open his accounts with cash, so Livingston gave Creswell $10 to start each account. Creswell also got seven bonds from Livingston and deposited three of them in the Fondren Branch and four in the Sharpstown Branch.

Gibraltar accepted the bonds but held them for several weeks before "clearing" the account for withdrawals. According to Gibraltar employees, Creswell checked several times before the bonds cleared to see

if he could withdraw funds from his accounts. Once, Livingston and Creswell went together to the Fondren Branch to check on the accounts.[1]

Finally, in December 1984, Gibraltar let Creswell withdraw money from the two accounts. According to Gibraltar employees and Creswell, Livingston instructed Creswell to withdraw about $700 in cash and five cashier's checks—one each to Community Investors Group ($7,500), Creswell ($2,000), and Texas Foreign Exchange, a store that sells foreign currency and gold coins ($8,000), and two to J & F Financial ($7,000 and $9,300).

Each defendant received a part of the money that Livingston and Creswell withdrew. Julia Williams received the $9,300 cashier's check to J & F Financial and deposited it in J & F's account at First National Bank of Bellaire. Craig Wooton, a vice president at First National, testified that Julia then wrote a check on J & F's account for $1,500 to Deborah Williams. Julia also wrote a J & F check to Samuel Stewart for $2,000 on December 11, 1984 as the partial repayment for her debt to Stewart from the two stolen bonds. A man named "Yuself" purchased merchandise at Texas Foreign Exchange with the $8,000 check. Creswell and Livingston deposited most of the rest of the withdrawal in Community Investors Group's account at the Citizens National Bank. According to Randall Dodds, a Citizens National Vice President, Community Investors Group and Livingston have the same address. Livingston then wrote checks on Community Investors Group's account to Creswell for $2,600 and to Julia Williams for $2,000.

Creswell testified that he received $4,000 for his role in these transactions, though Julia originally promised to pay him $5,000. The government originally indicted Creswell along with the other defendants, but he pleaded guilty and agreed to testify in the case.

1. Juanita Foster and Deborah Wheeler, tellers at Gibraltar Fondren, identified Livingston in

#### d. *Bonds 11 and 12*

Willie Livingston is separated from but still married to Katherine Livingston. In November 1984, Katherine asked Willie for some money. Willie gave Katherine one bond to cash at her bank and told her she could keep some of the proceeds. Katherine deposited the bond on November 29, 1984 in her account at the Huntsville National Bank and withdrew most of the money for Willie. On January 24, 1985, Katherine cashed a second bond, this time hoping to keep about $500. Eventually, the Huntsville Bank learned that the bonds were stolen. In the end, Katherine kept about $2,000 from the two bonds.

#### e. *The Government Investigation*

James Tunnell of the F.B.I. investigated the attempts to cash the bonds once they appeared in the Houston area. When he first interviewed Julia Williams, she told him that she dealt "only" with the two bonds that she received from Yusef Israel and gave to Samuel Stewart as rent. Eventually, she also admitted that she received a bond from "Anthony Goldfinger" for a car and that she used Linda Lusk to cash it.

Tunnell tried to locate Deborah Williams but could not. On October 8, 1985, however, Deborah called Tunnell to say that she heard that he was looking for her and that she was innocent. Tunnell urged Deborah to surrender, but she refused. Eventually, Tunnell tracked Deborah to the house of Ken Tyler, where he found her hiding in a closet.

### II. *The Indictment*

The two substantive statutory provisions which are the subjects of the indictments in this case are 18 U.S.C. § 2314 and 18 U.S.C. § 2315.

Title 18 U.S.C. § 2314 makes it a crime to "transpor[t] in interstate ... commerce, any goods, ... securities or money, of the value of $5,000 or more, knowing the same to have been stolen...." *See United*

court as the man who accompanied Creswell.

*States v. Herring,* 602 F.2d 1220, 1224 (5th Cir.1979), *cert. denied,* 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732 (1980); *United States v. Freeman,* 619 F.2d 1112, 1118 (5th Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981).

Title 18 U.S.C. § 2315 makes it a crime to "receiv[e], conceal, store, barter, sell, or dispose of any goods, ... securities, or money of the value of $5,000 or more ... which are part of or which constitute interstate ... commerce, knowing the same to have been stolen...." *See United States v. Tashjian,* 660 F.2d 829, 839 (1st Cir.), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981); *United States v. Strauss,* 678 F.2d 886, 993–994 (11th Cir.), *cert. denied,* 459 U.S. 911, 103 S.Ct. 218, 74 L.Ed.2d 173 (1982). The bonds each clearly had the value of $5,000 and the defendants do not claim otherwise.

Julia Williams and Livingston were charged with six substantive counts of the violation of the reception, possession, and disposing provision, § 2315. Deborah Williams was charged with one count of the transporting in commerce provision, § 2314. In addition, all defendants were charged separately in each count with violation of 18 U.S.C. § 2, which provides that one "who aids, abets, counsels, commands, induces, or procures [the] commission [of a crime] is punishable as a principal." Finally, all defendants were charged in Count 1 of the indictment with conspiracy to violate §§ 2314 and 2315.

The defendants complain on appeal that the district court made improper evidentiary rulings involving testimony of prosecution witness Collins (III), the evidence is not sufficient to support the convictions (IV), and the prosecutor made improper prejudicial closing arguments to the jury (V).

### III. *Collins' Testimony*

The defendants complain that the district court (1) improperly excluded evidence of a prior conviction offered to impeach Collins,

(2) improperly allowed the government to bolster Collins on direct examination, and (3) improperly failed to give a limiting instruction regarding Collins' testimony. We address each point individually.

### a. *The Prior Conviction*

Rule 609(a), Federal Rules of Evidence, provides that a witness may be impeached with evidence of a prior conviction for a crime involving "dishonesty or false statement." Rule 609(b), however, provides that evidence of a conviction that is over ten years old "is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence."

At trial, Deborah's attorney, Ronnie Harrison, offered evidence that Collins had been arrested and convicted in 1972 for writing a check without sufficient funds. The district court excluded this evidence. Writing a bad check with intent to defraud clearly involves "dishonesty or false statement" and would be admissible under Rule 609(a)(2). *See Petty v. Ideco,* 761 F.2d 1146, 1152 (5th Cir.1985). Harrison, however, did not explain the nature of Collins' crime or whether it involved the element of intent to defraud. Thus, Harrison did not show that Collins' conviction involved "dishonesty or false statement."

■ Moreover, Collins was convicted in 1972 and served no jail time, and his testimony in the case before us came more than ten years later—in February 1986. The government claims that Harrison failed to give written notice of her intent to introduce Collins' remote conviction, as required by Rule 609(b). Harrison does not contest this point. The district court has discretion to conduct the trial in an efficient and orderly manner in the admission or exclusion of evidence. *See United States v. Cathey,* 591 F.2d 268, 274–75 (5th Cir.1979). The district court properly excluded the evidence of Collins' conviction.[2]

---

**2.** Rule 609(a) also allows impeachment, subject to the ten year rule, with a prior conviction for

a crime "punishable by death or imprisonment in excess of one year [if] the court determines

Moreover, even if the district court erred in excluding evidence of Collins' 14–year-old conviction, evidentiary rulings constitute reversible error only if they affect "substantial rights" of a party. Fed.R. Crim.P. 52. Collins already had admitted to the jury that he twice lied about his source of the two bonds. Further impeachment with a remote conviction could not have affected the trial so as to require reversal in this case.

### b. *Alleged Bolstering*

Collins gave three versions to explain how he obtained the bonds—the Reno seller, Deborah Williams, and "Livingstone or Livingstan." At trial, Collins testified that he really received the bonds from Deborah and that the other two versions were lies orchestrated by Deborah. On direct examination, the government asked Collins why he recanted his Reno version when the F.B.I. challenged it. Collins responded, "It [the version implicating Deborah Williams] was the truth.... What I told at first was a lie." Also on direct examination, the government asked if the "Livingstone or Livingstan" version was true. Collins replied, "No, it's not. [I wrote the letter] to help [Deborah] if I could in any way."

Deborah Williams argues on appeal that in this testimony the government had improperly bolstered Collins' testimony against her. Fed.R.Evid. 608(a)(2) provides that one may support the credibility of a witness with evidence of truthful character "only after the character of the witness for truthfulness has been attacked." Premature bolstering may shift "the responsibility of determining the truth of the evidence" from the jury to a witness. *United States v. Price,* 722 F.2d 88, 90 (5th Cir. 1983), *cert. denied,* 473 U.S. 904, 105 S.Ct. 3526, 87 L.Ed.2d 651 (1985). In *Price,* a government agent/witness testified that he believed the testimony of government witnesses against the defendant, and the district court did not instruct the jury to disregard the agent's opinion. We reversed the conviction. *See also Raysor v. Port*

*Authority of New York & New Jersey,* 768 F.2d 34, 40 (2nd Cir.) (witness may not bolster herself by testifying about her religion or her faithful and long marriage), *cert. denied,* —— U.S. ——, 106 S.Ct. 1227, 89 L.Ed.2d 337 (1986).

In the case before us, the government did not improperly bolster Collins. The statement, "It [the version implicating Deborah Williams] was the truth," may imply that Collins tells the truth because he is a truthful person. Such an interpretation, however, stretches Rule 608 far beyond its intended purpose. The district court instructed the jurors that they must weigh the credibility of the witnesses. Collins' testimony did not interfere with the jury's function more than the oath that any witness takes to tell the truth. In short, Collins' testimony was not "evidence of truthful character" as defined in Rule 608.

Moreover, even if the government improperly bolstered Collins' character, the bolstering was harmless. A party may impeach its own witness, Rule 607, and the government exposed Collins for twice lying about his source of the bonds. Deborah's attorney cross examined Collins about his Reno and "Livingstone" versions. If the prosecutor had not exposed these allegedly false versions to the jury, the defendants certainly could have. *See United States v. Black,* 685 F.2d 132, 135 (5th Cir.) (government on direct examination may disclose plea agreements with its own witnesses to avoid the impression that it concealed such agreements if the defense first exposed such bargains), *cert. denied,* 459 U.S. 1021, 103 S.Ct. 387, 74 L.Ed.2d 518 (1982). We cannot conclude that Collins' admission to lying prejudicially *bolstered* his testimony.

### c. *Limiting Instruction*

The government introduced in evidence Collins' letter "To Whom It May Concern" implicating "Livingstone or Livingstan." This letter clearly was inconsistent with Collins' trial testimony that Deborah Williams gave him the bonds. As such, it was admissible as a prior inconsistent

that the probative value of admitting the evidence outweighs its prejudicial effect to the de-

fendant." Harrison did not show the potential punishment for Collins' prior conviction.

statement to impeach Collins. Fed.R.Evid. 613; *United States v. Sisto*, 534 F.2d 616, 622 (5th Cir.1976); *United States v. Miller*, 664 F.2d 94, 97 (5th Cir.1981), *cert. denied*, 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982). Livingston's attorney argues on appeal, however, that the district court should have cautioned the jury immediately after admitting the letter to consider it only to impeach Collins' credibility and not as evidence of Livingston's guilt.[3] If offered for its truth, Collins' letter clearly would have been hearsay with regard to Livingston's guilt and admissible only to impeach Collins. *See* Fed.R.Evid. 801(c) defining "hearsay".

■ Livingston's argument fails for two reasons. First, Collins himself admitted—on direct and cross examination—that he fabricated the letter at Deborah's request, and the government did not argue at trial that the letter actually incriminated Livingston. In other words, the letter was not hearsay under Rule 801(c), and it was clear to the jury that it was not offered for its truth. Second, the district court in its charge to the jury instructed that

> [Prior, inconsistent statements] have been offered ... solely to test the credibility of a witness and not to prove the truth of the matter asserted in those prior statements.
>
> [Y]ou must limit your consideration of those statements to determine what effect if any they have on your assessment of the witness' credibility.

The district court gave this instruction at the end of all of the evidence rather than when the government introduced Collins' letter into evidence. *See United States v. Dabish*, 708 F.2d 240, 243 (6th Cir.1983) (timing of limiting instruction is within district court's discretion). The instruction properly charged the jury not to consider statements in the letter for their truth. *Cf. Slade v. United States*, 267 F.2d 834, 839

(5th Cir.1959) (court told jury to consider prior inconsistent statement only to impeach witness' credibility but improperly failed to instruct the jury not to consider prior statement for its truth). The district court did not err by failing to give the limiting instruction at the time the letter was admitted.[4]

### IV. *Sufficiency of the Evidence*

■ We review the evidence in the light most favorable to the government and affirm if substantial evidence supports the convictions, that is, if a reasonable jury could have found guilt beyond a reasonable doubt. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942); *United States v. Loalza-Vasquez*, 735 F.2d 153, 158 (5th Cir.1984). Evidence may support a conviction even though it does not exclude "every reasonable hypothesis of innocence." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). "We must reverse if a reasonable jury must have had a reasonable doubt about guilt." *United States v. Moreno-Hinojosa*, 804 F.2d 845, 847 (5th Cir.1986).

The defendants claim that insufficient evidence supports their convictions on all counts. Specifically, each defendant argues that the evidence did not show (1) that the bonds were in interstate commerce and (2) that the defendants knew that the bonds were stolen. We address these claims in turn.

#### a. *Interstate Quality of the Bonds*

■ Whether the bonds were in interstate commerce is a fact question for the jury. *United States v. Tobin*, 576 F.2d 687, 693 (5th Cir.), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978); *United States v. Licavoli*, 604 F.2d 613 (9th Cir.1979), *cert. denied*, 446 U.S. 935,

---

**3.** Livingston's attorney preserved error by requesting such a limiting instruction at trial.

**4.** A prosecutor may not introduce a prior inconsistent statement under the guise of Rule 613 when its "primary purpose" really is to place incriminating hearsay before the jury. *United*

*States v. Hogan*, 763 F.2d 697, 703 (5th Cir. 1985); *Miller*, 664 F.2d at 97. Livingston does not challenge the prosecutor's motive in putting Collins on the stand. The "primary purpose" of Collins' testimony clearly was to incriminate Deborah Williams, not Livingston.

100 S.Ct. 2151, 64 L.Ed.2d 787 (1980). The case before us involves two statutes: 18 U.S.C. § 2314, which proscribes transportation of stolen property in interstate commerce, and 18 U.S.C. § 2315, which makes it a crime to receive, possess, sell, or dispose of stolen property that is "part of" interstate commerce.

■ Count seven of the indictment charged that Deborah Williams violated § 2314 by transporting stolen bonds in interstate commerce. David Collins testified that Deborah mailed the bonds from Houston to California, and these bonds bore the deposit stamp of Collins' California bank. Obviously, this use of the mails between two states would satisfy the interstate commerce requirement of § 2314.

Section 2315 requires a lengthier analysis. The district court instructed the jury that the bonds were part of interstate commerce

> if they moved from one state into another state as a result of a transaction or series of related transactions which have not been fully completed at the time of the ... acts alleged in the indictment.
> ....
> In determining whether the interstate movement of a stolen article has come to an end, [you] may consider the nature of the article and the manner in which it must be disposed of.

This instruction properly charged the jury. *See Licavoli,* 604 F.2d at 625; *Tobin,* 576 F.2d at 693 (famous art objects remained in interstate commerce while they "cooled off" for two years after being stolen before they could be sold without suspicion.).

■ Evidence showed that the bonds were stolen in New York, traveled to Texas, and had to be returned to New York to be cashed by Manufacturers Hanover Trust. The government did not show when the bonds arrived in Texas, but Chase recovered most of the stolen bonds outside of New York state. Officer Muldoon explained that the media publicized the theft in the New York area, which might have hindered attempts to cash the bonds in New York. The jury could believe that the defendants tried to cash the bonds far from the scene and time of the theft to avoid detection and that the bonds traveled within Texas as a continuation of their interstate movement. *Cf. United States v. Block,* 755 F.2d 770, 775 (11th Cir.1985) (affirming a similar jury finding).

Moreover, the defendants caused the bonds to be deposited in banks and savings associations in Texas and California, and these institutions had to send the bonds to New York for redemption. The defendants could not help but know the bonds would move in interstate commerce for redemption. In *Pereira v. United States,* 347 U.S. 1, 9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954), the Supreme Court ruled that depositing a check drawn on a California bank in a Texas bank account constituted interstate transportation for purposes of § *2314,* because the check "must be sent to the [out of state] bank for collection." Before handing the bonds to Stewart, Lusk, Creswell, or Katherine Livingston, the defendants possessed the bonds as "part of" interstate commerce because the bonds were worthless absent redemption in interstate commerce. In general, then, sufficient evidence supports the finding that the bonds were part of interstate commerce. We now examine each count of the indictment individually.

#### b. *Count Two: § 2315*

■ Count two charged Julia Williams for the Lusk transaction in June 1984. The bond that Julia gave to Lusk declared on its face that it matured on November 1, 1982. This fact might have alerted Julia that the bond was stolen, because one who possesses a bearer bond may redeem it for cash and reasonably does so upon or soon after maturity. Rather than cashing the bond herself, Julia went through Lusk, a near stranger. Julia also paid or promised to pay Conway and Lusk $1,500, or 30 percent of the bond's value, to cash the bond. The jury could believe that no legitimate purpose justified such a high payment, just as selling property for less than market value may be evidence that the seller knew the property was stolen. *See United States v. Smith,*

502 F.2d 1250, 1255 (5th Cir.1974) (defendant sold engines at 50 percent discount); *United States v. Meltzer,* 590 F.2d 607, 609 (5th Cir.1979); *United States v. Ranzoni,* 732 F.2d 555, 559 (6th Cir.1984) (defendant sold $100 cases of liquor for $25). In addition, according to Agent Tunnell, Julia falsely confessed that she dealt "only" with the two bonds she gave to Stewart, but on further questioning she admitted that she also used Lusk to cash another bond. A jury may consider a false exculpatory statement as evidence of consciousness of guilt. *See United States v. Brown,* 604 F.2d 347, 351 n. 2 (5th Cir.1979), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1649, 64 L.Ed.2d 237 (1980).

 Taken as a whole, the evidence is sufficient to support Julia's conviction for count two, selling or disposing of the bond knowing it to be stolen.

### c. *Counts Three and Four: § 2315*

Counts three and four involved the two bonds that Julia gave to Samuel Stewart as rent for the second floor offices in his building. As with the Lusk transaction, Julia did not try to cash the bonds herself but rather gave them to Stewart to cash. The bonds, like the Lusk bond, matured about two years before Julia gave them to Stewart. In addition, Julia repaid Stewart only $2,000 of the over $6,000 she owed him, thereby netting a benefit from the bonds of over $4,000. The jury could infer that Julia used Stewart to avoid her own detection.

According to Julia, she received the Lusk bond from car-buyer Anthony Sane and the two Stewart bonds from real estate-buyer Yusef Israel. The jury could disbelieve this remarkable coincidence—that Julia received three stolen bonds within a short period from two distinct business customers.

Finally, although we discuss each count of the indictment separately, the jury could consider the evidence as a whole when deliberating over any single count. Thus, for example, in deciding whether Julia knew that the Stewart bonds were stolen, the jury could consider the evidence that Julia knew the Lusk or Creswell bonds were stolen.

 We conclude that the evidence supports Julia's convictions for counts three and four for selling or disposing of the bonds knowing them to have been stolen.

### d. *Count Five: § 2315*

 Count five charged Julia Williams and Willie Livingston with possessing the seven bonds that Creswell cashed, knowing them to have been stolen. These bonds, like the others, matured on November 1, 1982. According to Creswell's testimony, Livingston introduced him to Julia, Julia asked him to open the two Gibraltar accounts, and Livingston gave him the cash and bonds for the initial deposits. Creswell received $4,000—Julia promised $5,000— for his simple services. Sufficient evidence supports the convictions under count five.

### e. *Counts Six and Eight: § 2315*

 Counts six and eight charged Willie Livingston with possessing the stolen bonds he gave to his wife, Katherine, in November 1984 and January 1985. Katherine cashed them and kept about $2,000. This fact alone could not support a finding that Willie knew the bonds were stolen, because Katherine was his wife. In addition, however, the bonds obviously matured on November 1, 1982, and this would arouse Livingston's suspicion. Finally, the critical evidence is that Livingston knew the Creswell bonds were stolen. Given all the evidence, we affirm the convictions for counts six and eight.

### f. *Count Seven: § 2314*

 Count seven charged Deborah Williams with transporting stolen bonds to David Collins. She received these bonds after Stewart returned them to Julia and told Julia that they were stolen. The bonds matured on November 1, 1982. Deborah offered Collins $3,000 to cash them for her and then told Collins to lie about where he received the bonds. In addition, she refused to surrender to Agent Tunnell, and Tunnell eventually found her hiding in Ken

Tyler's closet. *See United States v. Mesa,* 660 F.2d 1070, 1077 (5th Cir.1981) (evidence of concealment may be evidence of guilt). This evidence supports the jury's finding that Deborah knew the bonds were stolen.

### g. *Count One*

■ Count one charged all three defendants with conspiracy. Although count one charged a conspiracy to violate both § 2314 and § 2315, the government had to prove only that the defendants conspired to violate either one of the statutes. *United States v. Lyons,* 703 F.2d 815 (5th Cir. 1983); *United States v. Acosta,* 763 F.2d 671 (5th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985).

■ Sufficient evidence was introduced at trial to prove a conspiracy to violate § 2315 by the defendants. Livingston occupied one of the offices that Julia rented. He introduced Julia to Larry Creswell. Julia asked Creswell to open the Gibraltar accounts, and Livingston gave Creswell the cash and bonds to deposit. Livingston and Julia shared in the proceeds from the Creswell bonds. Sufficient evidence supports their conviction under count one.

■ The evidence linking Deborah Williams to the conspiracy is less direct but supports her conviction. The fact that Deborah and Julia are sisters alone does not justify the inference that they conspired together. *See United States v. Forrest,* 620 F.2d 446, 451 (5th Cir.1980). Other evidence, however, shows that Deborah joined the conspiracy. Deborah received $1,500 of the proceeds from the Creswell transactions, and the jury could consider such payments as evidence of her involvement in a conspiracy. If the bonds were legitimate, there was no reason at all for her to be paid such a sum. The most critical evidence to establish that Deborah was a co-conspirator, however, was the fact that she sent bonds to Collins in California in suspicious circumstances for him to cash them. These were the same bonds that Stewart had returned to Julia. The jury hardly could avoid finding that Deborah received the bonds from Julia.

In sum, the evidence supports all of the convictions in the case before us.

### V. *Government's Closing Jury Argument*

In its closing argument to the jury, the prosecutor stated at least eight times that the defendants or their lawyers had tried to "disguise" the truth and create doubt where none existed. Although no objection was made at trial, the defendants claim on appeal that the argument constituted misconduct and warrants reversal.

■ Though a prosecutor may state his views of the evidence and rebut the defense lawyer's closing argument, *United States v. Strmel,* 744 F.2d 1086, 1089 (5th Cir.1984), he should refrain from "unfounded and inflammatory attacks" on opposing counsel. *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1 (1985). We will reverse a conviction for prosecutorial misconduct, however, only if "substantial rights" of the accused have been affected. Fed.R.Crim.P. 52. To determine whether a prosecutor's misconduct was harmless, we may consider the prejudicial statements themselves, the efficacy of any cautionary instructions given by the district court, and the strength of the admissible evidence of guilt. *United States v. McPhee,* 731 F.2d 1150, 1145 (5th Cir.1984); *United States v. Dorr,* 636 F.2d 117, 120 (5th Cir.1981). Moreover, if the defendants do not object to improper argument, we reverse only in cases of "plain error"—that is, when the argument "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings and result[s] in a miscarriage of justice." *United States v. Montemayor,* 684 F.2d 1118, 1124 (5th Cir. 1982) (quoting *United States v. Graves,* 669 F.2d at 971).

■ The prosecutor's statements—that the defense attorneys "disguise" the truth—while perhaps somewhat extreme in repetition, actually did no more than attack the inferences that the defense drew from the evidence and thus were no worse than borderline as to proper jury argument. Even if the statements could be seen as constituting an improper attack on the veri-

**196**

ty of opposing counsel, they fell far short of reversible error. The district court instructed the jurors that they alone were to weigh the credibility of the witnesses and determine the facts from the evidence and that the statements of the lawyers were not evidence. This instruction cured any prejudice created by the prosecutor's statements. *See United States v. Shackelford,* 709 F.2d 911, 913 (5th Cir.) (discussing similar instruction), *cert. denied,* 464 U.S. 899, 104 S.Ct. 253, 78 L.Ed.2d 239 (1983); *United States v. Saenz,* 747 F.2d 930, 943 (5th Cir.1984) (discussing similar instruction), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985).

## VI. *Conclusion*

The evidence in this case, when viewed as a whole, supports the verdict of the jury, and no reversible error was committed by the trial court.

AFFIRMED.