**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 93-2837

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JON PAUL HAMILTON and
ALLEN LAMAR McMURREY,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Texas

(March 8, 1995)

Before KING, EMILIO M. GARZA and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

The only issue in this criminal appeal is whether the district court committed reversible error in refusing to admit, for impeachment purposes, evidence of certain past criminal proceedings against the star government witness. In light of the overwhelming amount of additional impeachment evidence the appellants were able to introduce, we find no basis upon which to reverse appellants' convictions, and we AFFIRM the judgment below.

BACKGROUND

Defendant-appellants Jon Paul Hamilton and Allen Lamar McMurrey were convicted by a jury on July 1, 1993 for burglary of a post office[1], theft of credit cards and U.S. Treasury checks from the mail[2], counterfeiting of U.S. Treasury checks[3] and sale of counterfeited checks[4]. A co-conspirator, Byron Bernard York, was charged and tried along with the appellants and was convicted on four counts, but he is not a party to this appeal. Hamilton and McMurrey do not challenge the sufficiency of the evidence to support their convictions. Both stipulated or testified at trial that (1) they broke into a Houston post office on September 7, 1992 and stole numerous checks, credit cards and other mail; (2) they used the stolen U.S. Treasury checks to produce counterfeit checks by scanning an original into a personal computer, manipulating the check numbers and printing the false checks on a color printer; (3) they arranged for the sale of 83 stolen credit cards and received the proceeds from the sale; and (4) they printed and planned to sell about $2 million worth of counterfeited Treasury checks.

However, Hamilton and McMurrey claimed as a defense that Calvin Stout, who became a paid government informant and the principal prosecution witness at trial, entrapped them into committing the crimes. Stout, Hamilton and McMurrey met in the

---

[1] 18 U.S.C. § 2115.

[2] 18 U.S.C. §§ 1029(a)(3), 1708.

[3] 18 U.S.C. § 471.

[4] 18 U.S.C. § 473.

spring or summer of 1992 when they were all attending Alcoholics Anonymous meetings in Houston. According to the defendants' testimony, they never would have committed any of the crimes but for Stout's overreaching and constant pressure on them. Both defendants claimed that from the night they met Stout, he repeatedly urged them to join him in various criminal enterprises and that they continually rejected these suggestions. Finally, McMurrey testified, Stout "essentially wore [him] down and won [him] over," and "manipulated me into thinking, well, hell, this will be easy." Hamilton also testified that Stout made the crimes sound "real easy." McMurrey and Hamilton testified that they then joined Stout in his proposed plan to burglarize a Federal Express drop box and a post office, and later participated in the counterfeiting and other crimes. They also testified that Stout made frequent references to his fictional contacts, "Hank" and "Guido," and hinted that "legs would get broken" if the defendants backed out of the deal. Defense counsel emphasized the fact that McMurrey and Hamilton, recovering alcoholics in their early 20s, were especially vulnerable and susceptible to entrapment by the 46-year-old Stout, who was shown to be experienced, manipulative and a practiced liar. A psychiatrist testified that Hamilton, in particular, suffered from depression that impaired his judgment and made him especially vulnerable to being misled.

Stout, on the other hand, testified that McMurrey, Hamilton and York committed the post office burglary on their own without any urging from him, and that in fact the defendants did not tell

3

Stout about the burglary until two days after it took place. After the defendants gave Stout a stolen credit card to use, Stout contacted a federal postal inspector and began cooperating with law enforcement authorities to gather information on McMurrey, Hamilton and York. Recorded conversations between Stout and the defendants were introduced at trial. In these conversations, the defendants arranged for Stout to sell 83 stolen Texaco credit cards, and they received and divided up the proceeds. They also gave Stout a sample counterfeited U.S. Treasury check to show to "Hank," Stout's alleged banker friend, to determine whether it was good enough to cash. They also had conversations with Stout regarding the production methods used to manufacture the counterfeited checks and the quality of the finished checks. The prosecution pointed out that, in the taped conversations, Hamilton and McMurrey did not show any moral reluctance to go through with the crimes, or any sign that they were being coerced. Rather, they discussed going to Europe for six months on the proceeds and made comments like, "Maybe we can all meet up [and] do the Paris thing ... French whore houses," and "It's so exciting ... [i]t seems too good to be true." When Stout suggested that they sell the stolen American Express card they had been using, McMurrey said, "I mean sh-- man, we were thinking about going out tomorrow maybe and buying 1,000 more dollars worth of stuff." Hamilton added, "I think we are going to hold on to that." The defense claimed that Stout came up with and pushed the idea to try to cash some of the business checks that had been stolen from the post office. However, on the tape, Hamilton is

4

the first to suggest this. During a conversation about going Europe, Hamilton said, "[H]ow much do you think we have in checks just sittin' in there; why can't we cash those?" Stout said, "What do you got?" Hamilton replied, "F---, checks for $50,000." The taped conversations also contain hints that Hamilton and McMurrey were committing crimes on their own even before they became involved with Stout. While the group was in Hamilton and McMurrey's apartment printing the checks, Stout asked whether a particular piece of equipment was the printer. Hamilton replied, "That's the laminator. That's the laminator that I make my fake ID's on, the laminator machine." On the same tape, the men discussed a mutual friend who was aware of some of Hamilton and McMurrey's activities and apparently didn't approve:

McMurrey: I think he got a little upset when we started every night going in breaking into buildings and stealing sh--.
Stout: Well.
McMurrey: I mean cause he thought, you know, we were doing like the sneakers trip.
Stout: The what trip?
Hamilton: Like high tech.
Stout. Oh. Well.
McMurrey: And what it finally boiled down to is we were heaving bricks through windows.
Hamilton: Is that before I knew how to pick locks?
Stout: I still ah, am amazed that you went and made two trips [during the September 7 post office burglary].
Hamilton: We've done like two trips like every place. ... There's only so much room in the car.

McMurrey, Hamilton and York were arrested on September 23, 1992 while on the way to a bank, along with Stout, to cash four of the counterfeit checks. A warrant search at Hamilton and McMurrey's apartment revealed counterfeit checks totalling $1,900,000, stolen Social Security checks, five computers, a scanner, a high-quality

5

color printer, laminating machines, cutting boards, bolt cutters, walkie-talkies, a videotape on breaking and entering, tools for picking locks, the front cover to a Federal Express drop box, and receipts showing the use of stolen credit cards and redemption of stolen utility bearer coupons. After they were arrested, McMurrey, Hamilton and York gave written statements admitting their participation in the charged crimes, but not mentioning any involvement by Stout in the post office and Federal Express burglaries. Additionally, the statements given after arrest contradicted the entrapment defense raised at trial in several areas, including who originated the idea for the burglaries and the counterfeiting.

## DISCUSSION

The defendant-appellants challenge their convictions on the basis that the district court refused to allow them to impeach Stout by questioning him about certain prior criminal proceedings. They claim that impeachment of Stout was especially important because the viability of their entrapment defense boiled down to a credibility choice between their testimony and Stout's testimony. The issue we address, therefore, is whether district court abused its discretion or violated Hamilton and McMurrey's Sixth Amendment right to confront the witness against them by excluding evidence of Stout's (A) pending felony deferred adjudication; (B) prior pardoned felony convictions; or (C) pending misdemeanor charges.

### Pending Deferred Adjudication for Felony Theft

In 1992, Stout pleaded guilty in Texas state court to felony

6

theft by check, for which he had been indicted in the fall of 1991. Adjudication of guilt was deferred, and on September 1, 1992, Stout was given a five-year term of probation and was ordered to pay a $500 fine and $1,800 restitution. As of the time of Hamilton and McMurrey's trial in June 1993, Stout was not paying the restitution as ordered. The district court refused to allow the defendants to introduce the court records of the deferred adjudication to impeach Stout, on the basis that when adjudication of guilt is deferred, there is no "conviction" to be admitted. However, the court did allow many of the underlying facts relating to Stout's 1992 theft-by-check prosecution, deferred adjudication and ordered restitution payments to come into evidence: (1) When Stout was asked on cross-examination whether he had been convicted of a felony in the last 10 years, he replied, "I'm on deferred adjudication." (2) During direct examination, Stout testified that in 1992, "I had a hot check out that I was making restitution on," and that "my cash flow situation was somewhat limited." (3) McMurrey testified that when he first met Stout in the spring of 1992, Stout told him he was "currently under indictment." (4) Another witness, who attended AA meetings with Stout, testified that Stout told him in 1992 that he had legal problems and had been ordered to pay restitution, and that he would go to jail if he didn't pay it. (5) The defense called to the stand a man who was Stout's victim in the underlying felony theft case. The victim, a gun show vendor who sold Stout a pistol and a framed piece of art, testified that Stout had given

him a worthless check and that Stout had been ordered to pay restitution, but had only paid part of it. (6) On cross-examination, Stout admitted that he was not current on his restitution payments.

Rule 609 of the Federal Rules of Evidence permits a witness to be questioned about any felony conviction or any conviction of a crime involving "dishonesty or false statement, regardless of the punishment." The district court in this case limited cross-examination on Stout's deferred adjudication because deferred adjudication is not a "conviction" under Texas law.[5] Although "conviction" status for the purpose of Rule 609 is properly determined by federal law rather than state law,[6] we hold that the district court's ruling was not an abuse of discretion. The few Fifth Circuit cases touching on this issue have indicated that when adjudication of guilt is deferred, there is no "conviction." See United States v. Georgalis, 631 F.2d 1199, 1203 (5th Cir. 1980)(holding that Rule 609 was violated when prosecutor attempted to cross-examine defendant about his deferred adjudication for

---

[5]See, e.g., Jones v. State, 843 S.W.2d 487 (Tex. Crim. App. 1992)(Defendant sought to impeach prosecution witness with prior deferred adjudication and probation for theft; Texas court held that deferred adjudication is not a conviction and that denying defendant the right to impeach a witness with deferred adjudication probation does not deny the defendant's constitutional right of confrontation), cert. denied, 113 S. Ct. 1858 (1993); see also Baehr v. State, 615 S.W.2d 713, 716 (Tex. Crim. App. 1981); Callins v. State, 780 S.W.2d 176, 196 (Tex. Crim. App. 1989)(opinion on rehearing), cert. denied, 497 U.S. 1011 (1990).

[6]See 28 CHARLES A. WRIGHT AND VICTOR J. GOLD, FEDERAL PRACTICE AND PROCEDURE § 6133 & n.31 (1993); United States v. Turner, 497 F.2d 406 (10th Cir. 1974), cert. denied, 423 U.S. 848 (1975).

felony check fraud); <u>United States v. Dotson</u>, 555 F.2d 134, 135 (5th Cir. 1977)(holding that defendant truthfully stated on firearm purchase form that he had no felony convictions, given the fact that adjudication of guilt was deferred and sentence suspended on his prior offense of felony receipt of a stolen car); <u>see also</u> <u>Martinez-Montoya v. I.N.S.</u>, 904 F.2d 1018 (5th Cir. 1990)(holding that petitioner's prior guilty plea and deferred adjudication for forgery did not amount to a "conviction" within the meaning of the Immigration Reform and Control Act, 8 U.S.C. § 1255a).

Even though Stout's deferred adjudication is not a "conviction," Hamilton and McMurrey argue, it shows motive and bias because Texas law allows for early termination of probated sentences, giving Stout a motive to lie on the stand to curry favor with the prosecution. However, the district court determined that Stout had not entered into any plea agreement or discussions with law enforcement or his probation officer. Appellants argue that Stout may have nevertheless been shading his testimony in an effort to please authorities, especially in the light of the fact that he was in default on his ordered restitution payments and thus in danger of having his probation revoked.

We hold that the district court admitted enough information about the deferred adjudication for the defendants to adequately argue Stout's possible bias to the jury. We will not disturb the district court's ruling.

### Pardoned Felony Convictions

Calvin Stout was convicted of armed robbery and theft by

9

check, both in 1973 in Oklahoma. He was sentenced to five years in prison on each case, but was released from confinement that same year. In 1975, the governor of Oklahoma granted Stout a pardon on these two felony convictions. Stout was granted "a full and free pardon." The pardon certificate, a pre-printed form, stated that

> "since [Stout's] release, it appears [that Stout] ... has conformed to all rules and conditions, and that documentary evidence has been submitted to show that he has not been arrested nor violated the law and that he has conducted himself in a law-abiding and upright manner."

The district court excluded the convictions for two reasons, because of the 1975 pardon and under Rule 609(b) because they were more than 10 years old.[7] However, McMurrey was allowed to testify that Stout told him he had been to prison before.

Rule 609(c) and the accompanying commentary draw a distinction between pardons based on actual innocence or a finding of rehabilitation (which make the underlying conviction inadmissible for impeachment) and pardons granted solely to restore civil rights (which have no relevance to character and do not impair the admissibility of the underlying conviction). FED. R. EVID. 609(c) & accompanying NOTES OF COMMITTEE ON THE JUDICIARY HOUSE REPORT NO. 93-650; see also United States v. Wiggins, 566 F.2d 944, 946 (5th Cir.)(holding that Rule 609 shows "a desire to accord a controlling

---

[7] "**Time limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." FED. R. EVID. 609(b) (emphasis added).

10

consideration to rehabilitation as opposed to executive grace or judicial invalidation"), cert. denied, 436 U.S. 950 (1978). The district court refused to recognize the distinction draw by Rule 609, instead ruling generally that "for a pardoned crime, the slate is wiped clean." McMurrey and Hamilton claim that the "good behavior" referred to in Stout's certificate of pardon is not an express finding of rehabilitation or actual innocence. The government, on the other hand, argues that a reasonable interpretation of Stout's pardon is that it was based on a finding of rehabilitation.

However, we need not decide whether the pardon alone would have made the convictions inadmissible. Because the convictions were more than 10 years old, their admissibility is governed instead by Rule 609(b). See United States v. Felix, 867 F.2d 1068, 1074 n.9 (8th Cir. 1989). We have read Rule 609(b) to say that the probative value of a conviction more than 10 years old is by definition outweighed by its prejudicial effect. "The general rule is inadmissibility. It is only when the court admits evidence of a conviction over ten years old that the court must engage in a balancing test on the record." United States v. Estes, 994 F.2d 147, 149 (5th Cir. 1993). In addition, the district court has broad discretion in its application of Rule 609(b). Id. at 148. Moreover, even if the court had erred in excluding evidence of Stout's 20-year-old convictions, "evidentiary rulings constitute reversible error only when they affect `substantial rights' of a party." FED. R. CRIM. P. 52; United States v. Livingston, 816 F.2d 184, 190-91

11

(5th Cir. 1987). As we will discuss, so much additional impeachment evidence was admitted in this case that further impeachment of Stout with these remote convictions would not have affected the trial so as to require reversal in this case. See id. at 191.

Pending Misdemeanor Charges

At the time of trial in June 1993, Stout had a misdemeanor DWI charge pending in Harris County, Texas. He also had an open warrant and a pending misdemeanor theft charge in Travis County, Texas. The district court excluded the evidence, ruling that

> "[p]ending misdemeanor charges are inadmissible on the representation from the government that there is no cooperation, understanding or any other form of relationship between the United States, its agents, agencies and any of the State agencies that might be interested in these prosecutions."

However, despite the ruling, the defense was allowed to elicit similar evidence from Stout's former girlfriend; she testified that Stout was in need of money in 1988 because "there was a warrant out for his arrest for hot checks in Austin, Texas. The checks totaled $1,000 and he asked me to borrow money from one of my best friends so that he wouldn't have to go to jail."

Hamilton and McMurrey claim that Stout's misdemeanor charges were admissible under Rule 404(b)[8] to show Stout's bias,

---

[8]Rule 404(b) provides that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." When a defendant seeks to introduce "prior bad acts" evidence against a government witness, this is often called "reverse 404(b)" evidence, because it is being used against the government rather than against the defendant.

opportunity and motive to give false testimony in order to negotiate for favorable resolution of the charges. However, the district court found no indication whatsoever that Stout had any agreement or pending negotiations to that effect. In addition, Stout testified that he had received no promises by anyone in connection with his testimony in this case and his pending misdemeanor charges. Stout even stated that he was unaware of his pending warrant in Travis County. We cannot see that the district court abused its discretion in this ruling. And again, we conclude that so much additional impeachment evidence was admitted in this case that further impeachment of Stout with the pending misdemeanor charges could not have affected the trial so as to prejudice Stout's substantial rights. See FED. R. CRIM. P. 52; Livingston, 816 F.2d at 191.

### Conclusion

We hold that the evidentiary rulings at issue did not infringe upon Hamilton and McMurrey's Sixth Amendment right to confront Stout, and the district court did not abuse its discretion in placing reasonable limits on the appellants' cross-examination. Listed below is the overwhelming additional impeachment evidence that the defendant-appellants were allowed to introduce to attack Stout and his testimony. In addition to eliciting information about Stout's deferred adjudication and obligation to pay restitution, the defendants introduced the following evidence: (1) Stout admitted on cross-examination that he had been involved in dealing cocaine, he had lied on his resume and he had held himself out to

13

be a lawyer. (2) An attorney testified that Stout had contacted her and offered, for a fee, to testify falsely on behalf of her client. (3) An attorney testified that his firm fired Stout as a legal assistant after Stout falsely held himself out as a lawyer and collected funds from a client. (4) Another attorney testified that his firm fired Stout as a paralegal after learning that Stout lied on his resume about attending Vanderbilt University and law school in Oklahoma, and that Stout lied that he was dying of rectal cancer. Stout was also fired because he often arrived at work drunk or hung over and because he improperly used confidential firm information to his own advantage. (5) A former girlfriend of Stout's testified that Stout is not truthful and that she doesn't trust him. (6) Another former girlfriend testified that Stout falsely told her he was an attorney, failed to repay her money she loaned him for a business venture, falsely told her that he was dying from a rare blood disease, and stole her car and many of her belongings while she was having surgery. She added that she is afraid of Stout and had to undergo therapy to recover from her relationship with him. (7) McMurrey testified that Stout told him that he had been in a lot of trouble with the law, had been to prison before, and was currently under indictment. (8) Two witnesses who attended AA with Stout testified that Stout offered to sell them illegal firearms and a shoulder-held rocket. (9) Another AA acquaintance testified that Stout tried to enlist his help in setting up a prostitution operation in which Stout would be the pimp. (10) At least seven witnesses testified that they

14

considered Stout to be dishonest and untruthful, and Stout was also described by various witnesses as "unstable," "threatening," "sick," and a "criminal scum bag." (11) Stout was fully cross-examined on the payments he received for being a government informant, and testimony from at least five witnesses, including Stout himself, showed that Stout was having financial problems, was always in need of money and appeared to be willing to do almost anything for money.

Therefore, we conclude that the court permitted defense counsel the opportunity to expose more than ample facts to the jury from which it could draw inferences relating to Stout's credibility and motive to entrap the defendants. In closing arguments, defense counsel pointed to all the "bad character" evidence and argued that Stout was manipulative, a skilled liar and an opportunist who needed money and targeted the defendants to get it. Hamilton's counsel additionally argued that Stout had a motive to lie on the stand to curry favor with the prosecutor in the hope that he could get some help with all his legal problems. We hold that the defendants were more than able to impeach Stout, and that it is very unlikely that the admission of the deferred adjudication records, the pardoned convictions and the pending misdemeanor charges would have affected the verdict. Although Hamilton and McMurrey do not challenge the sufficiency of the evidence to support the jury's rejection of their entrapment defense, we note that the government's case against entrapment was strong. The defendants stipulated to the criminal behavior. Stout's testimony

15

regarding the offense was corroborated by the tape recordings of his meetings and conversations with appellants, as well as by the written confessions of McMurrey, Hamilton and codefendant York and by the incriminating items seized from the appellants' apartment. The jury heard both versions of the events, along with Hamilton and McMurrey's ample impeachment of Stout and his testimony, and chose to reject the entrapment defense. We find no abuse of discretion, and we conclude additionally that any error the district court may have committed was harmless. See FED. R. CRIM. P. 52; United States v. Livingston, 816 F.2d 184, 190-91 (5th Cir. 1987).

AFFIRMED.