**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                       No. 95-5734

WILLIAM E. STEWART,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CR-95-81-A)

Argued: June 6, 1996

Decided: July 17, 1996

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge, and
CURRIE, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Benjamin Moffitt, MOFFITT, ZWERLING &
KEMLER, P.C., Alexandria, Virginia, for Appellant. Jack I. Hanly,
Assistant United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON
BRIEF:** Helen F. Fahey, United States Attorney, OFFICE OF THE
UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellant William E. Stewart was convicted of converting government property, 18 U.S.C. § 641, and of associated crimes of conspiracy, wire fraud, and mail fraud. He raises several contentions on appeal, principally that the district court improperly restricted his cross-examination of a government witness, and that testimony adduced during the trial unfairly prejudiced his case. We affirm.

I.

This case involves the conversion of Digital Terrain Elevation Data (DTED), which provides computerized imaging of the earth's surface. The Defense Mapping Agency (DMA) produces DTED by digitizing satellite imagery. The data has a variety of military uses and generally is not available to the public. Department of Defense contractors may be given access to DTED when necessary, but they are barred from copying it. The DTED at issue in this case was being used by Cornell University under such a contract.

Appellant Stewart was in the business of finding rare maps on behalf of clients. In late 1992, Motorola Corporation sought Stewart's assistance in locating maps of certain areas in Asia; Motorola wanted to digitize the maps into a computer format for use in expanding its cellular communications business. Stewart contacted Andrew Fox, a graduate student at Cornell University whom he had met before, to find out whether Cornell had the maps.

Fox discovered that Cornell had DTED for areas of Asia (and elsewhere) in which Motorola was interested. According to Fox, Stewart was made fully aware of the restrictions on circulating DTED. Stewart and Fox nevertheless set out to copy the DTED and sell it to Motorola. Over a period of months, Fox secretly transferred most of

2

the DTED at Cornell onto tapes, and Stewart paid Fox for his expenses. Stewart sent Motorola an index of the available DTED, a price list, and some sample tapes. Motorola, though, had difficulty reading the tapes, and so while it expressed interest in buying the data, it had not finalized a purchase at the time of Stewart's arrest.

Stewart also approached other potential buyers in 1993. One was a firm in Seattle, Washington, to whom Stewart sent a sample tape that Fox had copied. An employee of the firm, upon discerning that the tape contained DTED, notified DMA. The Defense Criminal Investigative Service (DCIS) then became involved. DCIS arranged for the firm to purchase a tape containing DTED for an area in China, for which Stewart charged $1750. DCIS also used an undercover agent to buy two more tapes from Stewart for $3800.

On November 22, 1993, DCIS agents searched Stewart's and Fox's residences. They discovered many of the tapes containing the DTED copied from Cornell. At Stewart's residence, agents also found a document showing that he planned to sell the data to Motorola for $540,000. In the course of searching Fox's residence, agents recovered some photographs of naked children. In a pre-trial motion, the government sought to bar any attempt to impeach Fox's credibility based on the photos, and the district court agreed.

Trial began on May 15, 1995. Fox testified on behalf of the government pursuant to a plea agreement, describing his and Stewart's unlawful conduct in detail, and alleging that Stewart fully understood the illegality of copying and selling DTED but wanted to pursue the enterprise in any event. Stewart denied any such awareness, testifying that, except for an initial question to Fox at the outset of their dealings, he never asked anyone whether copying DTED and profiting substantially from its sale was unlawful (even after realizing its sizable value). Stewart, though, admitted that he hoped to sell data that he obtained at little cost for $540,000. The jury convicted Stewart of conversion, and also of conspiracy, wire fraud, and mail fraud.

II.

On appeal, Stewart claims that the district court erred in barring any questioning of Fox about the pictures recovered at Fox's resi-

3

dence. The court's restriction, Stewart urges, violated his right to cross-examination, because it prevented him from exposing a possible motivation for Fox's testimony -- avoiding prosecution for possessing child pornography. See Delaware v. Van Arsdall, 475 U.S. 673 (1986).

We find this argument unpersuasive for several reasons. Initially, the government denies that it ever contemplated bringing charges against Fox based on the pictures, and there is simply no evidence in the record to suggest otherwise. More significantly, the argument Stewart now makes was not fairly presented to the district judge. The pretrial motions addressing the photographs debate their use to impeach Fox's credibility, not to question his motivation in testifying. The government's initial motion to prohibit any questioning about the photos was based solely on the ground that it was not probative of truthfulness. Fed. R. Evid. 608. Stewart, responding that the questioning should be allowed, likewise stressed its probative value on credibility under Rule 608. While his motion also contained some other statements regarding the photos, a fair reading of the motion reveals the unmistakable theme that Stewart sought to use the pictures to question Fox's character for truthfulness.*

This is borne out by comments of the parties and the judge in a pretrial hearing. Stewart's counsel explained his reasons for wanting to cross-examine Fox about the photographs in this manner:

> If you look solely . . . at pornographic pictures, you probably would say it doesn't meet the Rule 608 standard in terms of truthfulness or bearing on truthfulness. However, I think

_____

*Specifically, after discussing why the "photographs may very well meet the evidentiary standard of Rule 608 and be proper impeaching material," Stewart's motion also states that"when Andrew Fox was a defendant, the materials seized were defined by the government agents as `pornographic materials,' but after Mr. Fox's Rule 11 Plea Agreement and cooperation in the prosecution of Mr. Stewart, they now become just photographs of naked children and thus no longer pornographic." Stewart did not meaningfully expand upon this observation. His motion then concludes by reemphasizing its general argument "that these pornographic materials are very relevant because of the credibility issue in this case."

4

> that if you look at the community standard, . . . anybody that would have pictures like that . . . [w]ould probably not tell the truth. So, the underlying basis -- What I am suggesting is that we ought to . . . have a voir dire to determine how he got the pictures.

In response, the district judge said "I am not going to do that. It doesn't have anything to do with this. Whatever you think of pornographic material, it doesn't have to do with credibility."

The district court understandably interpreted Stewart's argument as related to impeaching Fox's credibility, and its decision to bar any such use of the photos was within its discretion. Appellant cannot now obtain reversal on the ground that he would have used the photographs to question Fox's motive in testifying. We agree with the First Circuit that it would be

> incongruous to hold that the trial judge committed error by prohibiting cross-examination to show bias when neither counsel nor the context in which he asked his question made his purpose clear to the judge. Reversal for denial of the right to show bias on cross-examination thus requires both an affirmative assertion of that right and a knowing decision by the judge to deny or limit it.

Cheek v. Bates, 615 F.2d 559, 563 (1st Cir.), cert. denied, 446 U.S. 944 (1980); United States v. Garcia, 531 F.2d 1303 (5th Cir.), cert. denied, 429 U.S. 941 (1976).

The district judge properly gave Stewart ample opportunity to cross-examine Fox. Stewart questioned Fox extensively about his motive in testifying in this case -- he asked Fox about his guilty plea to one count of conversion, including his eligibility for a downward departure in sentence for substantially assisting the government. U.S.S.G. § 5K1.1. Fox was questioned about why certain charges were not brought against him, what maximum penalties he faced, why the government recommended a downward departure, and why he avoided a prison sentence. Fox's motivation in testifying thus was squarely placed before the jury. See United States v. Hamilton, 48 F.3d 149 (5th Cir. 1995) (no error in excluding evidence of past crim-

5

inal proceedings against government witness when ample other impeachment evidence was introduced).

For these reasons, we believe the trial was a fair one and that Stewart received the benefit of a vigorous defense.

III.

Stewart also alleges that the district court allowed the government to make impermissible references to the military uses of DTED. There was never any suggestion, Stewart points out, that he had attempted to compromise national security. As a result, he asserts, testimony regarding DTED's military applications only served to unfairly prejudice him. And the district court, Stewart observes, had agreed in a pretrial hearing to cut short any excessive testimony on DTED's military uses.

We agree with Stewart that there is no evidence he attempted to compromise national security. In our view, however, the district court did not commit reversible error in allowing occasional references to DTED's military applications. The government is entitled to some latitude in describing the context of the charges against a defendant, including their seriousness. See United States v. Dominguez, 835 F.2d 694, 700 (7th Cir. 1987). Here, the comments of the prosecutor and certain witnesses on DTED's military uses did not rise to the level of reversible error or call into question the essential fairness of the trial.

IV.

We have reviewed appellant's remaining assignments of error, and find them to be without merit. For the foregoing reasons, the judgment is hereby

AFFIRMED.

6