**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

VANCE EVANS, a/k/a Nancy Evans,
a/k/a Georgia Johnson,
Defendant-Appellant.

No. 95-5783

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

WAYNE BULLARD, a/k/a Michael
Harrod, a/k/a Jeffrey L. Cosby,
a/k/a Ivan Jasper,
Defendant-Appellant.

No. 95-5784

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

KEVIN MICHAEL WELLS, a/k/a

Charles Rainey, a/k/a Bernard
Taylor, a/k/a Bernard Tyler, a/k/a
Christopher Westbrooks, a/k/a
Zermee Pryor, a/k/a McCullen Pitts,
Defendant-Appellant.

No. 95-5820

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Alexander Williams, Jr., District Judge.
(CR-95-46-AW)

Argued: September 24, 1996

Decided: November 27, 1996

Before WILKINSON, Chief Judge, and WILKINS and
WILLIAMS, Circuit Judges.

_____

Affirmed in part, vacated in part, and remanded for resentencing by
unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Clarke Francis Ahlers, Columbia, Maryland, for Appel-
lant Evans; James Dennis Murphy, Jr., Annapolis, Maryland, for
Appellant Bullard; Timothy Joseph Sullivan, SULLIVAN & SULLI-
VAN, College Park, Maryland, for Appellant Wells. Maury S. Epner,
Assistant United States Attorney, Greenbelt, Maryland, for Appellee.
**ON BRIEF:** Lynne A. Battaglia, United States Attorney, Sandra Wil-
kinson, Assistant United States Attorney, Greenbelt, Maryland, for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Vance Evans, Wayne Bullard, and Kevin Michael Wells were con-
victed by a jury of conspiring to commit bank fraud, see 18 U.S.C.A.
§ 371 (West 1966 & Supp. 1996); Bullard and Wells were also con-
victed of bank fraud, see 18 U.S.C.A. § 1344 (West Supp. 1996); 18

2

U.S.C.A. § 2 (West 1969). Evans and Bullard appeal their convictions. Evans claims that the Government's conduct at trial denied him effective assistance of counsel because prosecutors improperly referred to "other crimes" evidence during closing argument, and "personally attacked" defense counsel during rebuttal. After careful review of the record, we conclude that this contention is without merit and does not warrant discussion. See United States v. Adam, 70 F.3d 776, 780-81 (4th Cir. 1995) (holding that prosecutor's remarks were not sufficient to deprive Appellant of a fair trial) (citing United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir. 1983), cert. denied, Wissler v. United States, 466 U.S. 972 (1984)); Lindgren v. Lane, 925 F.2d 198, 204-05 (7th Cir.) (same), cert. denied , 502 U.S. 831 (1991); United States v. Livingston, 816 F.2d 184, 195-96 (5th Cir. 1987) (same). Bullard claims that the district court erred in failing to suppress physical evidence and oral and written statements made by him. Because Bullard's suppression arguments were rejected in United States v. Bullard, No. 95-5785, Slip Op. (4th Cir. Nov. 27, 1996), we will not consider them here.

In addition, Evans, Bullard, and Wells appeal their sentences, arguing that the district court erroneously computed the fraud losses attributable to them, thereby improperly increasing their offense levels under the Sentencing Guidelines. See United States Sentencing Commission, Guidelines Manual, §§ 1B1.3 (Relevant Conduct), 2F1.1 (Fraud and Deceit) (Nov. 1995). Wells also argues that the district court erroneously increased his base offense level two points for obstruction of justice. See U.S.S.G. § 3C1.1. We affirm Evans' and Bullard's convictions and remand to the district court for resentencing of each Appellant.

I.

Evans, Bullard, and Wells, along with several others, conspired to defraud banks and merchants in the Washington, D.C. area. They acquired identification documents in alias names, [1] opened fraudulent

_____

[1] Evans, a transvestite, used the aliases "Nancy Nelson" and "Georgia Johnson"; Bullard used the aliases "Michael Harrod," "Jeffrey Cosby," and "Ivan Jasper"; and Wells used the aliases"Bernard Taylor," "Robert Chalmers," and "Charles Rainey."

checking accounts in the alias names, "reordered" checks under the alias names for legitimate bank accounts held by innocent persons, and wrote fraudulent checks to local merchants and banks. To get cash, Appellants artificially inflated the balance of alias and legitimate accounts by stealing checks written from one uninvolved party to another and depositing these "booster" checks into the accounts. Then Appellants cashed checks from the accounts or used automated teller machine (ATM) cards to withdraw the fraudulently "boosted" sums in cash before the fraud could be discovered.

Agents of the United States Secret Service executed searches of Wells' and Bullard's apartments pursuant to warrants authorizing searches for evidence relating to federal bank fraud offenses. Law enforcement officers investigating the case also stopped and, after obtaining consent, searched an automobile in which Evans was a passenger. During these searches, agents found and seized fraudulent photograph-bearing identification documents, stolen checks, checks in alias names, and retail merchant receipts demonstrating purchases in alias names with fraudulent checks. During the search of Wells' apartment, agents found and seized three computers; agents had observed Wells take one of these computers a week earlier from the residence of Raheim Knox, a coconspirator. The computers seized from Wells' apartment contained information relating to certain of his own known aliases, and also to aliases employed by several of his coconspirators.

The evidence at trial, viewed in the light most favorable to the Government, see Glasser v. United States, 315 U.S. 60, 80 (1942), revealed that Evans, Bullard, and Wells either knew each other directly (as in the case of Evans and Wells), or knew other persons in common. For example, after their arrests, Evans, Bullard, and Wells each gave inculpatory statements in which they identified Knox as the source of certain of their fraudulent documents. The jury returned guilty verdicts on all counts, convicting all three Appellants of conspiring to commit bank fraud and convicting Bullard and Wells of bank fraud.

Following the return of guilty verdicts, a presentence report (PSR) was prepared for each Appellant. The PSR assigned each Appellant a base offense level of six for their fraud convictions. See U.S.S.G.

4

§ 2F1.1(a). Appellants' offense levels then were increased according to the amount of loss suffered as a result of their fraud. See U.S.S.G. § 2F1.1(b)(1). Evans' PSR attributed to him fraud loss of $182,749, increasing his offense level seven points, see U.S.S.G. § 2F1.1(b)(1)(H) (fraud involving loss of $120,000 to $200,000); Bullard's PSR attributed to him fraud loss of $302,549, increasing his offense level eight points, see U.S.S.G. § 2F1.1(b)(1)(I) (fraud involving loss of $200,000 to $350,000); and Wells' PSR attributed to him fraud loss of $1,877,615, increasing his offense level 12 points, see U.S.S.G. § 2F1.1(b)(1)(M) (fraud involving loss of $1,500,000 to $2,500,000).

Evans, Bullard, and Wells objected to the amount of fraud loss attributed to them in their PSRs, each contending that he was responsible for substantially less fraud loss. The Government also objected, challenging the amount of loss attributed to Bullard and Wells. The Government claimed that additional fraud loss should be attributed to Bullard and indicated that it would seek at sentencing to increase his offense level nine points under U.S.S.G. § 2F1.1(b)(1)(J) (fraud involving loss of $350,000 to $500,000), instead of the PSR's recommended increase of eight points under U.S.S.G. § 2F1.1(b)(1)(I). The Government also admitted that the probation officer's attribution to Wells of $1,877,615 of loss was excessive and indicated that it would seek to increase his offense level only nine points under U.S.S.G. § 2F1.1(b)(1)(J) (fraud involving loss of $350,000 to $500,000), instead of the recommended 12-point increase under U.S.S.G. § 2F1.1(b)(1)(M).

At sentencing, the district court adopted the loss calculations offered by the Government. The court determined that fraud loss of $189,950 should be attributed to Evans, resulting in a total offense level of 13.[2] See U.S.S.G. § 2F1.1(b)(1)(H). An offense level of 13, combined with a criminal history category of IV, gave Evans a guideline range of 24-30 months. The district court sentenced him to 30 months imprisonment.

_____

**2** The district court also added two points to Evans' offense level for "more than minimal planning" under U.S.S.G.§ 2F1.1(b)(2)(A), but then subtracted two points because he was a "minor participant" under U.S.S.G. § 3B1.2(b), leaving a total offense level of 13.

Next, the district court determined that fraud loss of $403,577 should be attributed to Bullard, increasing his offense level to 15. See U.S.S.G. § 2F1.1(b)(1)(J). The court added an additional two points for "more than minimal planning" under U.S.S.G. § 2F1.1(b)(2)(A), resulting in a total offense level of 17 for the fraud conviction. The court then considered Bullard's conviction for possession of a firearm by a felon,[3] which carried a base offense level of 20. See U.S.S.G. § 2K2.1(a)(4)(A) (prior felony conviction for crime of violence). Combining the fraud and the firearm offense levels under U.S.S.G. § 3D1.4 (Combined Offense Level), the district court computed a total offense level of 22. A total offense level of 22, with a criminal history category of IV, gave Bullard a guideline range of 63-78 months. The district court sentenced him to 63 months imprisonment.

Finally, the district court determined that fraud loss of $403,577 should be attributed to Wells, increasing his offense level to 15. See U.S.S.G. § 2F1.1(b)(1)(J). The court added an additional two points for "more than minimal planning" under U.S.S.G. § 2F1.1(b)(2)(A), and an additional two points for obstructing justice under U.S.S.G. § 3C1.1, resulting in a total offense level of 19. The court then considered Wells' conviction for possession of a firearm by a felon,[4] which carried a base offense level of 14. See U.S.S.G. § 2K2.1(a)(6) (prohibited person). Combining the fraud and the firearm offense levels under U.S.S.G. § 3D1.4, the district court computed a total offense level of 20. An offense level of 20, with a criminal history category of IV, gave Wells a guideline range of 51-63 months. As with Bullard, the district court sentenced Wells to 63 months imprisonment.

II.

We review the district court's application of the Sentencing Guidelines to the facts under a "due deference" standard, examining factual determinations for clear error and legal conclusions de novo. See 18 U.S.C.A. § 3742(e) (West Supp. 1996); United States v. Daughtrey, 874 F.2d 213, 217-18 (4th Cir. 1989). Because the district court's

_____

[3] We affirmed Bullard's firearm conviction in United States v. Bullard, No. 95-5785, Slip Op. (4th Cir. Nov. 27, 1996).
[4] We affirmed Wells' firearm conviction in United States v. Wells, No. 95-5823, 1996 WL 614623 (4th Cir. October 25, 1996).

6

determination of the amount of loss attributable to each Appellant is a factual one, we will vacate Appellants' sentences and remand for resentencing if the determination was clearly erroneous. See United States v. Castner, 50 F.3d 1267, 1274 (4th Cir. 1995) (citing United States v. West, 2 F.3d 66, 71 (4th Cir. 1993)). In addition, we will vacate Appellants' sentences and remand if the record is inadequate and does not permit meaningful review. See United States v. Wilson, 980 F.2d 259, 260 (4th Cir. 1992) (remanding for resentencing "because the record is insufficient to permit a determination of whether loss was correctly calculated"); see also Tice v. Botetourt County Sch. Bd., 908 F.2d 1200, 1208 (4th Cir. 1990) (remand appropriate where inadequacy of record will not permit meaningful review).

The Sentencing Guidelines provide a base offense level of six for crimes involving fraud or deceit, see U.S.S.G. § 2F1.1, and then set forth a schedule for incrementally increasing the offense level according to the amount of loss suffered as a result of the fraud, see U.S.S.G. § 2F1.1(b)(1)(A)-(S). In order to calculate the amount of loss under § 2F1.1(b)(1) correctly, district courts must first apply the principles of relevant conduct. Cf. United States v. Irvin, 2 F.3d 72, 78 (4th Cir. 1993) (holding that district courts must apply relevant conduct principles in determining the quantity of narcotics properly attributable to each coconspirator), cert. denied, 510 U.S. 1125 (1994); United States v. Gilliam, 987 F.2d 1009, 1012-13 (4th Cir. 1993) (stating that "in order to attribute to a defendant for sentencing purposes the acts of others in jointly-undertaken criminal activity, those acts must have been within the scope of the defendant's agreement and must have been reasonably foreseeable to the defendant").

The relevant conduct provision of the Sentencing Guidelines, § 1B1.3, provides that specific offense characteristics, i.e., the loss amount that should be attributed to a defendant under § 2F1.1, is to be determined on the basis of the following:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions

7

> of others in furtherance of the jointly undertaken criminal activity,
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1)(A)-(B). Thus, losses resulting from Appellants' fraudulent activities may be characterized as either "directly attributable" loss under U.S.S.G. § 1B1.3(a)(1)(A), or "reasonably foreseeable" loss under U.S.S.G. § 1B1.3(a)(1)(B).

At sentencing, in order to ascertain the losses that could be attributed to each Appellant, the district court heard testimony from David Thomas, a Special Agent of the United States Secret Service, and received summaries prepared by him which were offered by the Government as calculations of the loss attributable to each Appellant.**5** The summaries listed the various bank accounts where fraudulent activity had taken place, the amount of loss suffered by the particular bank because of the fraud, the dates of fraudulent activity, and the Government's explanation why the loss suffered should be attributed to the specific Appellant. (J.A. at 470-76.) In addition, the district court heard arguments from the parties about whether the losses suffered by the various accounts should be attributed to each particular Appellant. Ultimately, the district court adopted in full the loss calculations offered by the Government, finding that $189,950 in losses should be attributed to Evans, and that $403,577 in losses should be attributed to both Bullard and Wells. (J.A. at 457.) Accordingly, the district court increased Evans' offense level for fraud by seven points, and Bullard's and Wells' offense levels by nine points. (J.A. at 457-69.)

Appellants make two arguments challenging the district court's loss calculation. First, they argue that the district court erroneously calculated the amount of fraud loss that could be directly attributed to them under U.S.S.G. §§ 2F1.1(b)(1) and 1B1.3(a)(1)(A). Second,

_____

**5** At oral argument, the Government conceded that the summaries were inaccurate in several respects.

8

they argue that the losses erroneously attributed to them by the district court as "directly attributable" losses may not be attributed to them as the reasonably foreseeable acts of others in furtherance of a jointly undertaken criminal activity, see U.S.S.G.§§ 2F1.1(b)(1) and 1B1.3(a)(1)(B), because the district court failed to make specific factual findings respecting the scope of the jointly undertaken criminal activity or the reasonable foreseeability to the individual Appellants of the acts of coconspirators. We address Appellants' arguments in turn.

A.

Appellants argue that the district court erred in adopting the Government's calculation of losses "directly attributable" to Appellants because the Government's direct loss calculation was flawed. In estimating the amount of "directly attributable" loss, the Government included losses on bank accounts where an alias was used by a particular Appellant. For example, losses on an account in the name of Zermee Pryor were attributed to Wells because a fraudulent payee on the account was Charles Rainey, an admitted alias of Wells. (J.A. at 255.)

In addition, the Government also added losses on bank accounts that were related to a particular Appellant by physical evidence found in searches of Appellants' residences and persons. For example, losses suffered by two legitimate accounts in the names of Staci Parreco and C. & J. Duplaa were attributed to Wells and Bullard, because the accounts were fraudulently "boosted" by checks from the Leonard Wood account, and documents regarding Leonard Wood were found in searches of Wells' and Bullard's residences. (J.A. at 255-56, 470-72.) Similarly, losses suffered by the Mark Balksdale Standard Federal account, two Pamela Terry accounts, two David Gilford accounts, and two Charles Rainey accounts were attributed to Bullard because each of those accounts were "boosted" by checks from the Donna Anderson account, which itself was "boosted" from checks from the William Brown account, and physical evidence regarding William Brown was found in the search of Bullard's residence. (J.A. at 274-75.)

We agree in part with Appellants, and conclude that the record on appeal does not support the district court's calculation of "directly

9

attributable" fraud loss. First, in estimating the amount of "directly attributable" loss, the Government correctly included losses on bank accounts where the record revealed that an alias was used by a particular Appellant as a drawer, payee, or maker on the account. Losses resulting from "acts or omissions" of the Appellant (or his aliases) are "directly attributable" losses. See U.S.S.G. § 1B1.3(a)(1)(A).

However, in calculating "directly attributable" losses, the Government erroneously included losses on bank accounts that were related to a particular Appellant solely by physical evidence found in searches of Appellants' residences and persons. Based on the record before us, the various items of physical evidence linking Appellants to the fraud loss -- such as the retail merchant receipts found in Bullard's and Wells' residences -- standing alone create a connection to each individual Appellant that is too tenuous to establish "directly attributable" fraud loss. Including these losses in its calculation of "directly attributable" losses was improper because the record on appeal does not reflect that the losses on these accounts resulted directly from Appellants' fraudulent acts. See United States v. Evbuomwan, 992 F.2d 70, 72 (5th Cir. 1993) (district court's attribution to defendant of $90,471 in losses was erroneous because only $1,500 in losses were directly caused by defendant's fraudulent use of a credit card); United States v. Balogun, 989 F.2d 20, 22 (1st Cir. 1993) (noting that defendant was "directly involved" in ten of 124 fraudulent claims and remanding for determination of whether remaining 114 fraudulent claims could be attributed to him as "reasonably foreseeable" loss); cf. United States v. Sepulveda, 15 F.3d 1161, 1197 (1st Cir. 1993) (stating in drug conspiracy case that defendant is directly responsible only "for drugs he personally handled or anticipated handling"), cert. denied, 114 S. Ct. 2714 (1994).

Accordingly, we remand to provide the district court the opportunity to sufficiently explain whether losses attributed to Appellants are "directly attributable" or "reasonably foreseeable" losses. In doing so, we note that the Government did not argue, and the record on appeal does not establish, that losses should be directly attributed to Appellants as acts or omissions "aided, abetted, counseled, commanded, induced, or willfully caused by the defendant." See U.S.S.G. § 1B1.3(a)(1)(A). We express no opinion as to whether on remand the Government can establish "directly attributable" loss under such an

10

"aiding and abetting" theory. To give guidance to the district court, we review the losses attributed to each Appellant.

1. Evans

At sentencing, the Government endeavored to prove that losses totalling $189,950 suffered by 11 bank accounts should be directly attributed to Evans. (J.A. at 476.) On appeal, the Government argues that the "entire loss calculation proven by the[G]overnment as to Evans was based on a direct, rather than `reasonably foreseeable', loss analysis." (Appellee's Br. at 9.) Evans concedes that $18,000 in loss should be directly attributed to him (Appellants' Br. at 22), but contends that the Government's calculation of "directly attributable" loss, which was adopted by the district court (J.A. at 461), is clearly erroneous.

We agree that the losses suffered by five of the 11 accounts should be directly attributed to Evans because the record establishes that Evans (employing an alias) acted as either a drawer, payee, or maker of checks written from the account. (J.A. at 278 (Georgia Johnson account), 278-79 (Hayes/Nelson and Webb Hayes accounts), 279 (Steven Guttenberg and Silver Spring Rehabilitation Center accounts).) With respect to these five accounts, which suffered losses totalling $38,039, the district court correctly determined that the losses should be directly attributed to Evans.

The Government also included as "directly attributable fraud loss" (J.A. at 476), losses totalling $151,911 suffered by six accounts. The Government included losses totalling $87,455 suffered by the Eric Jackson and Boycee Poore accounts in its estimate of losses directly attributable to Evans (J.A. at 476), because the accounts had some of the same payees as the Steven Guttenberg account (J.A. at 279-80, 312-14), an account the losses of which were correctly directly attributed to Evans.[6] (J.A. at 279.) The record on appeal, however, does not support the Government's contention that the losses on these six accounts should be directly attributed to Evans. Nowhere does the

_____

[6] Losses suffered by the Steven Guttenberg account were directly attributable to Evans because "Georgia Johnson," an alias of Evans, was a payee of the Guttenberg account. (J.A. at 279.)

11

record indicate that Evans (or one of his aliases) was a drawer, payee, or maker, or that he aided or abetted the fraud, on either the Eric Jackson or Boycee Poore accounts.

While evidence of common payees might support a finding that defrauding the accounts was within the scope of an agreement to undertake criminal activity by Evans and his coconspirators or that the fraudulent activity of other coconspirators was reasonably foreseeable to Evans, see U.S.S.G. § 1B1.3(a)(1)(B), such evidence does not support a finding that the losses should be directly attributed to Evans. Based on the record before us, we cannot conclude that the district court properly directly attributed fraud losses from these two accounts to Evans; we therefore remand to the district court for further proceedings respecting these accounts.

With respect to the remaining four accounts, namely, the Brian Tankersley, Marquitta Coleman, William Ecker, and Alliance for Aging Research accounts, the record before us is not sufficiently clear (J.A. at 279-82, 317-19), to assess meaningfully the propriety of attributing the losses on these accounts to Evans under either a "directly attributable" or a "reasonably foreseeable" theory. Consequently, we remand consideration of these accounts to the district court as well. See Wilson, 980 F.2d at 260, 262; see also Tice, 908 F.2d at 1208.

2. Bullard

The Government estimated that Bullard's fraudulent activities relating to 27 bank accounts resulted in a "directly attributable" loss of $308,685. (J.A. at 473-74.) The Government also estimated that "reasonably foreseeable" losses attributable to Bullard totalled $94,892. (J.A. at 474-75.) Like Evans, Bullard concedes that some loss, in his case $22,000, should be directly attributed to him (Appellants' Br. at 47), but contends that the Government's calculation of "directly attributable" fraud loss and "reasonably foreseeable" fraud loss, both of which were adopted by the district court (J.A. at 462-65), is clearly erroneous.

We agree with the district court that losses suffered by six of the 27 accounts should be directly attributed to Bullard because Bullard (employing an alias) acted as either a drawer, payee, or maker of

12

checks written from the account. (J.A. at 256 (Staci Parreco and C. & J. Duplaa accounts), 273 (Glenn Eckanger and Sean McCoart accounts), 274 (Myrtle Jackson and Charles Longworth accounts).) With respect to these six accounts, which suffered losses totalling $75,746, the district court was correct in directly attributing the fraud loss to Bullard.

The record on appeal, however, does not support the Government's contention that 14 of the remaining 21 accounts can be directly attributed to Bullard. Each of the 14 accounts was connected by the Government to Bullard entirely through evidence found in the search of his residence.[7] The record on appeal does not indicate that Bullard (or one of his aliases) was a drawer, payee, or maker on any of the 14 accounts, nor does it establish that he aided or abetted the fraud

_____

[7] The Eric Jackson account, which suffered a loss of $59,000, was directly attributed to Bullard because documents bearing the name Michael Eric Jackson were found in the search of his residence. (J.A. at 274-75.) Similarly, the Leonard Wood account, which suffered a loss of $500, was directly attributed to Bullard because documents bearing the name Leonard Wood were found during the search. (J.A. at 273.) The James Earl and Raymond Green accounts, which suffered losses totalling $10,365, were directly attributed to Bullard because they were "boosted" by checks written from the Leonard Wood account. (J.A. at 275.) The Robert Chalmers account, which suffered losses totalling $5,475, was directly attributed to Bullard because that account was "boosted" by checks written from the Bernard Taylor account, and documents bearing the name Bernard Taylor (an alias of Appellant Wells) were found at Bullard's residence. (J.A. at 275.) The Donna Anderson NationsBank and Mark Balksdale Riggs Bank accounts, which suffered losses totalling $15,130, were directly attributed to Bullard because those accounts were "boosted" by checks written from the William Brown account, and documents bearing the name William Brown were found during the search of Bullard's house. (J.A. at 274.) The Mark Balksdale Standard Federal account, two Pamela Terry bank accounts, two David Gilford bank accounts, and two Charles Rainey bank accounts, which suffered losses totalling $55,696, were directly attributed to Bullard because each of those accounts was fraudulently "boosted" by checks written from the Donna Anderson account, which itself was "boosted" by checks written from the William Brown account, and documents bearing the name William Brown were found during the search of Bullard's residence. (J.A. at 274-75.)

13

affecting these accounts. See U.S.S.G. § 1B1.3(a)(1)(A). Adding the $181,665 in losses on these accounts to the losses directly attributable to Bullard was therefore improper. Based on the record before us, we cannot conclude that the district court correctly attributed fraud losses from these accounts directly to Bullard. Accordingly, we remand for consideration of these accounts.

With respect to the remaining seven accounts, namely, the Purnell Walker, Ruth Paul, William Ecker, Silver Spring Rehabilitation Center, Steven Guttenberg, Alliance for Aging Research, and Holzbierlein accounts, the record is so unclear and the findings of the district court so nonspecific (J.A. at 274-77), that we are unable to assess whether the losses on these accounts should be attributed to Bullard. Accordingly, we remand consideration of these accounts to the district court. See Wilson, 980 F.2d at 260, 262; see also Tice, 908 F.2d at 1208.

On remand, a minimum of $75,746 of loss must be attributed to Bullard. Such a minimal loss calculation, however, would decrease Bullard's total offense level only from 22 to 21, and his guideline range from 63-78 to 57-71 months imprisonment.[8] In some instances, because the sentence of 63 months imprisonment imposed on Bullard falls within both guideline ranges, we would declare the district court's erroneous loss calculation to be harmless error and decline to remand. Remand is not necessary when "the reviewing court con-

_____

[8] At most, Bullard's total offense level will decrease one level (from 22 to 21), even though the fraud loss attributed to him may decrease substantially, because he was convicted of multiple offenses. Under the Guidelines, when a defendant is convicted of more than one offense, the combined offense level is determined by taking the highest offense level and increasing that level by an amount specified in U.S.S.G. § 3D1.4 (Combined Offense Level). Here, Bullard was convicted of bank fraud and of unlawfully possessing a firearm. The offense level for Bullard's firearm conviction is 20, see U.S.S.G. § 2K2.1(a)(4)(A) (prior felony conviction for a crime of violence); the offense level for Bullard's fraud convictions is 14-17, depending on the amount of fraud attributed to him on remand, see U.S.S.G. § 2F1.1. Thus, Bullard's offense level will begin at 20, and will increase either one or two points (to 21 or 22), depending on the amount of loss attributed to him on remand. See U.S.S.G. § 3D1.4.

14

cludes, on the record as a whole, that the error was harmless, i.e., that the error did not affect the district court's selection of the sentence imposed." See Williams v. United States, 503 U.S. 193, 203 (1992) (citations omitted).

In Kelly v. United States, 29 F.3d 1107 (7th Cir. 1994), the district court applied an incorrect sentencing range, but came up with a sentence that nevertheless fell inside the correct range. The Government argued that the district court's error was harmless because the sentence fell within both ranges. The court rejected this argument, stating that

> absent an express statement that the [district] court would impose the same sentence even if a different range were applicable, it is difficult to imagine a case in which an appeals court could declare with the requisite degree of confidence that the application of an incorrect range would amount to a harmless error . . . .

Id. at 1111; see also United States v. Mount, 966 F.2d 262, 265 (7th Cir. 1992) ("An appellate court may be confident that the choice of range did not affect the sentence when the district judge says so.").

Here, the "record as a whole" suggests that Bullard was sentenced at the bottom of the guideline range because the district court found Wells and Bullard to be equally culpable. (J.A. at 465, 467 ("[B]ecause I don't see any distinction between [Mr. Wells] and Mr. Bullard, [Mr. Wells] will be given the same sentence as Mr. Bullard was given.").) On remand, Wells' guideline range, and his corresponding sentence, may be lowered. See post at 15-17. As a result, we remand to allow the district court to determine both the proper guideline range for sentencing Bullard, and where within that guideline range Bullard's sentence should fall. United States v. Surasky, 976 F.2d 242, 247 (5th Cir. 1992) (remanding and stating that "[f]rom the record before us, it is not unreasonable to conclude that . . . the district court might well choose to give [the defendant] a lesser sentence.").

3. Wells

At sentencing, the Government estimated that Wells' fraudulent activities relating to 31 bank accounts resulted in "directly attribut-

15

able" loss of $359,377 (J.A. at 470-71), and "reasonably foreseeable" loss of $44,200 (J.A. at 472). Like Evans and Bullard, Wells concedes that some loss, $57,192, should be directly attributed to him, but contends that the Government's calculation of "directly attributable" fraud loss and "reasonably foreseeable" fraud loss, both of which were adopted by the district court (J.A. at 465-66), is clearly erroneous.

We agree that losses suffered by five of the 31 accounts should be directly attributed to Wells because Wells (employing an alias) acted as either a drawer, payee, or maker of checks written from the account. (J.A. at 255 (Zermee Pryor account), 260-61 (Christopher Westbrooks and Robert Chalmers accounts), 262 (two Charles Rainey accounts).) With respect to these five accounts, totalling $59,792, the district court correctly attributed the fraud loss directly to Wells.

The record on appeal, however, does not support the Government's contention that 18 of the remaining 26 accounts can be directly attributed to Bullard. Each of the 18 accounts was connected to Bullard by the Government through evidence found in the search of his residence.[9] The record on appeal does not indicate that Wells (or one

_____

[9] The Leonard Wood account, which suffered a loss of $500, was directly attributed to Wells because documents bearing the name Leonard Wood were found in the search of Wells' residence. (J.A. at 255.) The Staci Parreco, C. & J. Duplaa, James Earl, and Raymond Green accounts, which suffered losses totalling $25,965, were directly attributed to Wells because those accounts were "boosted" by checks written from the Leonard Wood account. (J.A. at 255, 261-62.) The McCullen Pitts account, which suffered $3,907 in losses, was directly attributed to Wells because that account was "boosted" by an account "with the name of Cameron [who was] a payee on the Zermee Pryor account as well as Charles Rainey." (J.A. at 256.) Two Mark Balksdale accounts, two Pamela Terry accounts, and the Donna Anderson account, which suffered losses totalling $39,317, were directly attributed to Wells because each account was fraudulently "boosted" by checks written from the Dirk Magruder account, and documents bearing the name Dirk Magruder (an alias of coconspirator Darrell Brown) were found in the search of Wells' residence. (J.A. at 257-59.) The Myrtle Jackson and Charles Longworth accounts, which suffered losses totalling $15,946, were directly attributed to Wells because both accounts were made payable to Ivan Jasper,

16

of his aliases) was a drawer, payee, or maker on any of the accounts, nor does it establish that he aided or abetted the fraud affecting these accounts. See U.S.S.G. § 1B1.3(a)(1)(A). As a result, adding the $153,812 loss on these 18 accounts to the losses correctly determined to be directly attributable to Wells was improper. Accordingly, we remand to the district court for consideration of these accounts.

With respect to the remaining eight accounts, namely, the Purnell Walker, Ruth Paul, Silver Spring Rehabilitation Center, Steven Guttenberg, Alliance for Aging Research, Eric Jackson, William Ecker, and Holzbierlein accounts, the record before us is not sufficiently clear (J.A. at 260, 63-66), to permit us to assess meaningfully whether the losses on these accounts should be attributed to Wells under either a "directly attributable" or "reasonably foreseeable" theory. Accordingly, we remand consideration of these accounts to the district court. See Wilson, 980 F.2d at 260, 262; see also Tice, 908 F.2d at 1208.

B.

The Government argues that even if the losses attributed to Appellants were not all "directly attributable" losses, they were nevertheless "reasonably foreseeable" to Appellants and therefore were properly attributed to them. (Appellee's Br. at 7-9.) In complex conspiracies, the Government argues, "reasonably foreseeable" loss analysis is "perfectly appropriate." (Appellee's Br. at 8.) With respect to Appellant Evans, for example, the Government argues that

_____

and documents bearing the name Ivan Jasper (an alias of Appellant Bullard) were found in the search of Wells' residence. (J.A. at 259.) The Boycee Poore account, which suffered $28,475 in losses, was directly attributed to Wells because documents bearing the name Boycee Poore were found in the search of his residence. (J.A. at 263.) Similarly, two David Gilford accounts, which suffered losses totalling $13,752, were directly attributed to Wells because documents bearing the name David Gilford were found in Wells' residence. (J.A. at 262.) The Jimmy Kissee account, which lost $689, was directly attributed to Wells because the account was made payable to David Gilford. (J.A. at 265.) Finally, the Brian Tankersley account, which lost $25,261, was directly attributed to Wells because it was payable to Dennis Walls, and documents bearing the name Dennis Walls were found in Wells' residence. (J.A. at 264.)

17

> it was entirely appropriate under the related [sic] conduct guideline for the trial judge to attribute [to] Evans not just fraud loss directly attributable to his own conduct in his alias names, but to the conduct of his coconspirators in connection with the same accounts.

(Appellee's Br. at 10.)

We agree that here, in the context of a "jointly undertaken criminal activity," see U.S.S.G. § 1B1.3(a)(1)(B), "reasonably foreseeable" losses may be attributed to Appellants under principles of relevant conduct. Cf. Irvin, 2 F.3d at 78; Gilliam, 987 F.2d at 1012-13. However, the district court -- because it found that all losses should be directly attributed to Appellants -- never discussed whether the losses should be attributed to Appellants as the consequence of reasonably foreseeable acts of coconspirators.**10** The court simply stated:

> I just do not believe that it is necessary to restrict the fraud amount solely to those who either made it or withdraw [sic]

_____

**10** The entire amount of fraud loss may not be attributed to each Appellant simply because each Appellant was convicted of conspiracy to commit bank fraud. The conspiracy and the jointly undertaken criminal activity are not necessarily coextensive. The Application Note to § 1B1.3 provides that

> the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement).

U.S.S.G. § 1B1.3, comment. (n.2). See also United States v. Irvin, 2 F.3d 72, 77 (4th Cir. 1993) (stating that "[u]nder the guidelines, a coconspirator is held accountable for the quantity of drugs reasonably foreseeable to him within the scope of his unlawful agreement," not for the quantity of drugs attributed to the conspiracy as a whole); United States v. Gilliam, 987 F.2d 1009, 1012-13 (4th Cir. 1993) (same); William W. Wilkins, Jr. & John R. Steer, Relevant Conduct: Cornerstone of the Federal Sentencing Guidelines, 41 S.C. L. Rev. 495, 510-12 (1990) (same).

18

it or paid it or wrote it or ordered checks or what have you. This scheme required far more. It involved . . . a number of different acts and [though] each of the particular defendants did not necessarily make or draw or steal or order or pay or use[ ] alias[es] in every single check, clearly in a number of them, they did.

(J.A. at 458.)

Whether this statement from the district court constitutes a finding that the acts of other coconspirators were within the scope of Appellants' agreements to jointly undertake criminal activities is arguable. Cf. United States v. Jenkins, 4 F.3d 1338, 1347 (6th Cir. 1993) (noting in drug conspiracy case that "the district court did not address, implicitly or explicitly, the scope of the criminal activity [the defendant] agreed to jointly undertake," and that as a result, the court "lack[ed] an adequate basis on which to differentiate between" the defendant and other coconspirators), cert. denied, 114 S. Ct. 1547 (1994).

In any event, the district court failed even to consider whether the fraudulent acts of coconspirators on bank accounts not directly defrauded by Appellants were reasonably foreseeable to them. We recognize that in most circumstances general findings regarding reasonable foreseeability are adequate, see United States v. Catalfo, 64 F.3d 1070, 1082 (7th Cir. 1995), cert. denied , 116 S. Ct. 1683 (1996), and that under § 2F1.1(b), "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information," U.S.S.G. § 2F1.1, comment. (n.8). However, losses not directly attributable to Appellants may not be attributed to them via principles of relevant conduct in the absence of a finding of reasonable foreseeability. See U.S.S.G. § 1B1.3(a)(1)(B); Evbuomwan, 992 F.2d at 72-73; United States v. Fuentes, 991 F.2d 700, 701 (11th Cir. 1993); Balogun, 989 F.2d at 22; cf. Irvin, 2 F.3d at 78 (narcotics); Gilliam, 987 F.2d at 1012-13 (same).

Here, the district court failed to determine whether the amount of fraud loss on the accounts was reasonably foreseeable to Evans, Bullard, and Wells and within the scope of their agreements prior to determining their offense levels under § 2F1.1. Accordingly, we vacate Appellants' sentences and remand for resentencing.

19

III.

Wells raises an additional issue pertaining to application of the sentencing guidelines. He maintains that the district court erroneously increased his base offense level two points for obstructing justice, see U.S.S.G. § 3C1.1, for removing a computer containing evidence of bank fraud from the residence of a coconspirator and concealing the computer in his residence. Our review of the record indicates that this contention is without merit. See U.S.S.G.§ 3C1.1, comment. (n.3(d)) (enhancement applies where defendant conceals or attempts to conceal evidence material to an official investigation or judicial proceeding); United States v. Hicks, 948 F.2d 877, 884-85 (4th Cir. 1991) (concealing evidence constitutes obstruction of justice).

IV.

Accordingly, we affirm the conviction of Evans, vacate the sentences of all Appellants, and remand to the district court for resentencing consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR RESENTENCING

20