UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 94-10028
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                    versus

ALLEN LANDERMAN,
DAVID DEWAYNE HANKS,
a/k/a Ed Banks and
RANDALL BOYD ZEIGLER,
a/k/a/ Bo Zeigler,

                                        Defendants-Appellants.

          * * * * * * * * * * * *


               _____

                    No. 94-10403
               _____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                    versus

RODNEY LEE HOLLOMAN,
a/k/a/ Rod Weatherly and
WALTER HUMBERT CUSHMAN,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court for the
               Northern District of Texas
_____
                    March 31, 1997

Before BENAVIDES, STEWART, and DENNIS, Circuit Judges.

BENAVIDES, Circuit Judge:

This direct criminal appeal involves, among other things, a challenge to the district court's refusal to allow a prosecution witness to be cross examined regarding his alleged bias. Finding that the limitation of cross examination resulted in a violation of the Confrontation Clause and that such error was not harmless, we vacate and remand.

I.   BACKGROUND

The evidence at trial demonstrated that from 1989 to 1992 several companies were established to market oil and gas drilling projects. The projects were marketed through the use of written prospectuses sent by mail to potential investors and through the companies' sales brokers telephoning potential investors. The prospectuses contained inflated cost estimates for drilling the wells; misrepresentations regarding the qualifications of various persons involved in the projects; and false representations that certain individuals performed work for the companies. During the telephone solicitations, the brokers would make false representations and promises about the investment. Additionally, names of employees and affiliated companies were given as references to potential investors. These references are known as "in-house" references.

There are five appellants on this consolidated appeal: Walter Humbert Cushman III (Cushman), who essentially owned and operated the companies, but represented that he was only a consultant; Rodney Lee Holloman (Holloman), who initially was involved in establishing the companies but thereafter worked primarily at the drill sites; Allen Landerman (Landerman), who was an attorney

2

representing the companies; David Dewayne Hanks (Hanks), who appraised a drilling rig and for a brief time was a sales manager; and Randall Boyd Zeigler (Zeigler), the personnel manager who interviewed and hired sales brokers for the companies.

A.  GREAT SOUTHWEST ENERGY

In the latter part of 1989, Sam Hooper, who had been involved in the oil and gas business, met with Cushman, Holloman, and Rob Overstreet (Overstreet),[1] to discuss the development of two oil and gas wells, the Strickland and Parkman wells. Thereafter, Great Southwest Energy was incorporated, and the articles of incorporation listed Hooper as the initial director and incorporator. Neither Cushman's nor Holloman's name was listed in the articles of incorporation or in the company's mailings to potential investors. Cushman and Holloman represented that they were outside consultants for Great Southwest Energy.

Great Southwest Energy marketed the Parkman and Strickland wells. This project, known as the Twin Elephant, was offered to investors in a prospectus. Cushman, Holloman, and Hooper agreed to divide the profits among themselves. Richard Hewitt, an attorney, prepared the Twin Elephant prospectus, which disclosed the participation of Cushman and Holloman and their criminal records. Pursuant to Cushman's instructions, Daphne Bostick, a secretary, removed pages from the prospectus indicating that the company was the subject of an investigation by the State Securities Board.

Hooper resigned on December 31, 1989, because the investors'

---

[1]  Overstreet was tried with the instant appellants and acquitted by the jury.

money was not being spent as represented in the prospectus. Despite his resignation, Great Southwest Energy continued to list Hooper as president on company mailings until April of 1990. After Hooper's name was removed, Overstreet was listed as president of Great Southwest Energy.

Meanwhile, Grant Ottesen (Ottesen) owned and operated Oil Consortium of Texas, Inc.[2] Because Ottesen's business was experiencing financial difficulties, he merged it with Great Southwest Energy in late 1989. Names of prospective investors were obtained primarily from "lead" lists. Using these lists, the brokers for Great Southwest Energy made telephone contact with prospective investors. For a short period of time, Ottesen recruited sales brokers for Cushman. Ottesen left the newly merged company in April of 1990 but returned in September of 1990.

Ottesen testified that the following misrepresentations were made to investors: Hooper was president of the company during the Twin Elephant program; projects were already producing oil; almost all units had been sold; and the return on the investment was nearly immediate. Ottesen heard Cushman admit that he knew the Twin Elephant would not have any production and that he did not intend to spend any more money than had already been spent. Ottesen also testified that in-house references were given to investors, false drilling reports were given to salesmen, drilling

_____

[2] Ottesen was indicted along with the appellants. Ottesen pleaded guilty to two counts of fraud and testified against the appellants.

4

costs were inflated,[3] investor funds were used to pay salaries and expenses of the office, and that completion funds[4] were called early and used for purposes other than drilling. Ottesen also testified that Zeigler, Hanks, Holloman, Cushman, and Don Cronn (also known as Tom Green) were all part of conversations in which this conduct was discussed.

Tom Grace began working as a sales broker for Great Southwest Energy in December 1989. Grace advised the investors that the wells were going to be horizontally drilled. In fact, the wells were never horizontally drilled. According to Holloman, they attempted to horizontally drill the Strickland well but could not reach the bottom of the hole because the well had been sitting dormant for seven or eight years. Grace testified that he resigned in May 1990 because the company did not procure a management license for the oil and gas brokerage and also because he learned "about the backgrounds of Mr. Cushman and Holloman."

Jo Beth Smith (Smith) performed accounting work for Great Southwest Energy in the early part of 1990. Holloman had Smith cash $5,000-$6,000 checks for expenses or "to go on a trip." Neither Cushman nor Holloman received salaries or paychecks. The evidence revealed that, instead of receiving salaries or being on the company payroll, the company paid the expenses of Cushman and

---

[3] Bruce Damron, a petroleum engineer, testified that he had estimated the cost of drilling the Strickland well at $640,000. Yet the prospectus provided that the cost would be $1,258,100.

[4] Ottesen explained that the brokers should not call for completion funds until after it has been determined that a well is commercially viable.

Holloman.

Lisa Holdge (Holdge) began working as a receptionist for Great Southwest Energy in February 1990. Cushman subsequently asked her to become secretary-treasurer of the company, and she agreed. The position was in name only. Cushman instructed Holdge to create false invoices for oil field services. After the Securities Board investigated the company, Cushman directed Holdge to place rescission letters in all the investor files. The recision letter explained to the investors that they could obtain a return of the money they invested. Cushman, however, told her to send the recision letter to certain selected investors, and she complied. Holdge resigned after discovering that her name had been listed as a reference in one prospectus.

B.    HARTFORD OIL AND GAS

In June 1990, Hartford Oil and Gas (Hartford)[5] was incorporated to market the Silver Fox and Slover Beever wells. After that time, the name Hartford was used in place of Great Southwest Energy. Glen Chambers was later named president of Hartford. David Card (Card), a codefendant who pleaded guilty to wire fraud, worked as a sales broker. Hanks was sales manager at Hartford for a short time, and Ottesen, after returning to the company, became sales manager in spring of 1991.

Jeff Everett (Everett), Cushman's son-in-law, bought Foxridge Securities (Foxridge), a company that was a licensed brokerage, for

---

[5]    Subsequently, the company was called Hartford Exploration. Because it is unclear exactly when Hartford changed names, we will refer to both companies as "Hartford."

Cushman.[6]  At Cushman's request, Card began working at Foxridge. Cushman and Card actually operated Foxridge.  Cushman made Card president of Foxridge.  Hartford used Foxridge as a reference in the prospectus for the Slover Beever project.  Investors would call Foxridge to obtain information regarding the project, and Card "told them that [Foxridge was] doing due diligence on [Hartford.]" Foxridge closed in November of 1990, and upon Foxridge's closing, Card returned to Hartford.

In June 1990, Card hired Grace to work for Foxridge Securities.  Grace typed the prospectus for the Silver Fox well, including the criminal backgrounds of Cushman and Holloman in the prospectus.  He observed Cushman remove that information from a prospectus.  Grace worked for Allen Landerman, an attorney, from December 1990 until August 1991.  It was Landerman's opinion that the joint ventures were not securities.  Grace put together the prospectus for the Slover Beever well, the Grand Slam No. 1, and the Grand Slam No.2.  Cushman did not want the criminal histories disclosed in the prospectus because it "made sales very difficult."

Ulrike Bell (Bell) worked for Cushman at Hartford as a bookkeeper from July 1990 to February 1991.  She regularly signed checks in blank for Cushman, and Cushman asked her to make false invoices.  Several of the representations about Bell's qualifications listed in the prospectus were false.[7]

---

[6]  Everett previously had opened a bank account in the fictitious name of East Texas Well Service to allow Cushman to cash the Great Southwest Energy checks.  The bank statements were mailed to Everett's home address.

[7]  Also, Raymond Wottrich was never hired by Cushman as a

Zeigler was the personnel manager and interviewed and hired sales brokers. He knew that Foxridge's name was being given as a reference. According to Kevin Rose, who worked for Hartford, sales brokers at the companies made whatever representations were necessary to persuade investors, and the information that the brokers imparted to the investors over the phone had been supplied by Donn Cronn, Zeigler, Overstreet, Cushman, and Holloman.

Teresa Stauffacher, a receptionist, was instructed to give Pearsall Oil Field Supply as a reference to investors. The telephone number for Pearsall was actually a telephone in Zeigler's office at Hartford, and when that phone rang, Zeigler had Stauffacher answer it. Cushman admitted to Stauffacher that his name was not on any documents because it would be a red flag for the federal authorities. Zeigler admitted to Stauffacher that his name was not listed on anything because he had "a wife and kids and was not going down."

C.   HORIZONTAL DRILLTEX

Cushman hired Royce Calk (Calk), a certified public accountant, to do accounting work for Hartford and later made Calk president of a company called Horizontal Drilltex. It was falsely represented to investors that Horizontal Drilltex and Hartford were separate entities and that Horizontal Drilltex had drilled between 20 and 30 wells. Additionally, completion funds, which were only to be called from an investor after the well was completed, were called before drilling began.

---

petroleum engineer as represented in the Silver Fox prospectus.

Hanks, Holloman, Overstreet, and Stanley Crutchfield met with Jim Meyers (Meyers), who sold Horizontal Drilltex a drilling rig for $109,000. Holloman signed a promissory note for the rig on behalf of Horizontal Drilltex. Hanks appraised the drilling rig at $1,250,000. Meyers thought that, after improvements, the rig would be worth $350,000 to $400,000 on the market. The drilling rig was used to raise $1,000,000 in investor funds, which was deposited in Horizontal Drilltex's account.

D.    EXCITING TANS

Terry Donahue,[8] Cushman, and Marylin Cook set up a tanning salon called "Exciting Tans" using money from Cushman and money that investors had sent to Hartford and Great Southwest Energy for the drilling of the oil and gas wells. This money was treated as a loan to Exciting Tans. To repay the loan, Exciting Tans would send money every week to Matuso Holding Company, which was used as a holding company to funnel money back to Cushman.[9]

On one occasion, Donahue heard Cushman and Landerman in a conversation deciding that $23,000 (a $15,000 check and a $8,000 check) from Cushman would be routed through Landerman's client trust account and then to Exciting Tans. That money was used to start a second tanning salon. Cushman's investment was also returned to him by allowing his employees to charge services at Exciting Tans against any amounts owed to him.

---

[8]    Donahue pleaded guilty to wire fraud and money laundering prior to testifying.

[9]    Dana Bien worked for Cushman and regularly cashed $2,000 checks for Cushman that were written to Matuso Holding Company.

E.    EVIDENCE REGARDING INVESTORS

Various investors testified that they would not have invested in the oil and gas projects had they known that Cushman and Holloman were the true owners of the company, that Cushman and Holloman had criminal records, that the investor funds were not being used for drilling wells, and that Holloman had never drilled a well.

An auditor for the Government testified that the total amount of investor funds received from the marketing of the five oil and gas drilling projects was $5,283,487, that the total amount of refunds to investors was $61,206, and that the total amount of royalties paid was $71,385.

F.  PROCEDURAL HISTORY

On February 10, 1993, a 24-count indictment was returned charging Cushman, Holloman, Hanks, Landerman, and Zeigler, along with seven other defendants with violations of conspiracy, mail fraud, wire fraud, money laundering and criminal contempt. Ultimately, on October 6, 1993, a third superseding 32-count indictment was returned charging Cushman, Holloman, Hanks, Landerman, Zeigler, and six other defendants with conspiracy, mail fraud, wire fraud, and money laundering. Additionally, a separate superseding indictment was returned charging Cushman and Holloman with criminal contempt.

On November 15, 1993, trial began on the 32-count indictment. The next day a mistrial was granted. The retrial began on November 22, 1993. The five defendants that are now party to this appeal were found guilty on all counts submitted to the jury: Cushman,

10

counts 1-4 and 6-32;[10] Holloman, counts 1-4 and counts 6-30; Hanks, 1, 25, 26, and 27; Landerman, 1, 31, 32; and Zeigler, 1, 20, 28, 29, and 30.  Cushman and Holloman were later tried on a separate superseding indictment charging five counts of contempt, and both were found guilty on all five counts.

The district court imposed the following sentences of imprisonment and fines:  Cushman received 290 months and a $40,000 fine; Holloman received 210 months and a $30,000 fine; Hanks received 52 months and a $10,000 fine; Zeigler received 60 months and a $10,000 fine; and Landerman received 135 months and a $10,000 fine.

II.  ANALYSIS

A.   RESTRICTION OF CROSS EXAMINATION REGARDING WITNESS BIAS

All five appellants, Cushman, Holloman, Landerman, Hanks, and Zeigler, argue that the district court violated their confrontation rights under the Sixth Amendment by improperly restricting defense counsel's cross examination that was intended to demonstrate bias on the part of Grant Ottesen, a prosecution witness.  More specifically, the district court prohibited the appellants from questioning Ottesen regarding his pending felony charge in state court and any effect it might have on his motivation to testify in the instant federal proceeding.[11]  The Government counters that the pending charge was not relevant to Ottesen's motive to testify against the appellants and that the "appellants were otherwise

_____

[10]  Count 5 was not submitted to the jury.

[11]   The defense also wanted to admit this evidence to rebut Ottesen's testimony that he had never used any drug but marijuana.

11

allowed to fully cross examine him."[12]

Although the scope of cross examination is within the discretion of the district court, that discretionary authority comes about only after sufficient cross examination has been granted to satisfy the Sixth Amendment. United States v. Restivo, 8 F.3d 274, 278 (5th Cir. 1993), cert. denied, __ U.S. __, 115 S.Ct. 54 (1994). "The Confrontation Clause of the Sixth Amendment is satisfied where defense counsel has been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." Id. (citation and internal quotation marks omitted). To show an abuse of discretion, the appellants must show that the limitations imposed on cross examination were clearly prejudicial. Restivo, 8 F.3d at 278.

Prior to testifying at the appellants' trial, Ottesen, pursuant to a written plea agreement, pleaded guilty to two counts of fraud in connection with the offenses that are the subject of this appeal. Ottesen's plea agreement provided that "[u]pon

---

[12] The Government also asserts that the pending state charge was not a final conviction that could be used to attack Ottesen's credibility under Rule 609(a) of the Federal Rules of Evidence. While this assertion certainly is correct, in the instant case, it is of no moment. The appellants were not attempting to use the pending criminal charge as a general attack on Ottesen's credibility. Instead, they were attempting to effect a more particular attack on Ottesen's credibility by exposing his possible bias or ulterior motive for testifying. See Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110 (1974) (explaining the difference between exposing on cross examination a prior criminal conviction for the purpose of affording the jury a basis to infer that the witness would be less likely to be truthful and exposing on cross examination a bias, prejudice, or ulterior motive of the witness).

12

request of the defendant, [the] United States agrees to bring to the attention of any other prosecuting authority the nature and extent of the defendant's cooperation." The plea agreement was admitted into evidence. At the time he pleaded guilty to the two federal offenses, Ottesen had a pending delivery of cocaine charge in state court. The Government filed a motion in limine seeking to prohibit the appellants from questioning Ottesen regarding the pending charge, which the district court granted.

During the instant trial, Ottesen testified that he pleaded guilty to one count of mail fraud and one count of wire fraud and that he was awaiting sentencing. The plea agreement provided that, at sentencing, the Government would move to dismiss Ottesen's 15 remaining counts in the indictment. Additionally, the Government had agreed that, prior to sentencing, it would make known to the court the nature and extent of Ottesen's cooperation. The agreement further provided that the Government may seek a substantial assistance reduction in Ottesen's sentence under § 5K "should the Defendant, in addition to full cooperation, substantially assist the United States and law enforcement agencies in investigating and prosecuting criminal matters." On cross examination, when asked whether he considered the Government's dismissal of the remaining counts a benefit, Ottesen replied that he was "not putting any weight on that." He did acknowledge that the possibility of obtaining sentence reduction would be a "benefit."

Defense counsel tendered cross examination questions regarding the pending state charge, and the district court allowed Ottesen to

13

answer those questions outside the presence of the jury.[13]  Ottesen admitted that the state case, which carried a potential life sentence, was pending when he entered into the plea bargain with the Government.  When asked whether he expected the Government to make a favorable recommendation to the state prosecutor regarding his cooperation, Ottesen answered that he did not know and that it had not been discussed.[14]

Defense counsel then offered the testimony, arguing that it showed Ottesen's motive to testify, his bias, and his prejudice.  The court responded as follows:  "Well, I haven't heard him say anything that would cause you to think that that's so.  So if that's the reason it's being offered, I will exclude the testimony.  Even if it had some slight relevance, its improper or undue

---

[13]  The Government asserts that the record does not reflect that any of the appellants joined in requesting the proffered questions.  The record indicates, however, that the district court instructed the defense attorneys to designate one "attorney to conduct examination of various witnesses on the subjects of cooperation with the Government, plea agreements, and related matters."  Moreover, the district court expressed his displeasure with an attempt by Landerman's attorney to make a proffer regarding the termination of his cross examination of Ottesen.  The following colloquy exemplifies the court's position and the futility of an attempt to independently voice an objection to the district court's ruling:

> [Landerman's attorney]:  May I make a proffer on [the] termination of my cross-examination?
>
> THE COURT:     We don't have time to do that.  There are more important things, Mr. Rosenberg.  I need for you to comply with my rulings, and then we wouldn't have these problems.

[14]  According to Cushman, "Bill Coos, the State Prosecutor, states the charges were dismissed against Ottesen upon request of the Federal Prosecutors as a result of Ottesen's testimony against Cushman."

14

prejudicial effect would outweigh it."

Contrary to the district court's holding, "[t]he partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." Davis, 415 U.S. at 316, 94 S.Ct. at 1110 (internal quotation marks and citation omitted). We acknowledge that a district court is afforded broad discretion in determining the probative value of evidence to determine its admissibility. United States v. Abel, 469 U.S. 45, 50, 105 S.Ct. 465, 468 (1984). Further, it is well established that a district court may impose reasonable limits on defense counsel's questioning into the potential bias of a government witness to prevent "harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant." Olden v. Kentucky, 488 U.S. 227, 232, 109 S.Ct. 480, 483 (1988). Of course, as set forth previously, until we determine that the cross examination satisfied the Sixth Amendment, the district court's discretion does not come into play. Restivo, supra.

In the case at bar, after hearing Ottesen's answers to the proffered questions, the district court stated that Ottesen apparently did not interpret the clause in the plea agreement to include the state prosecuting authorities. That determination, however, should not have been made by the district court. Instead, the jury, as the trier of fact, should have been allowed to draw its own inferences regarding Ottesen's credibility and determine what effect, if any, the pending criminal charge had on Ottesen's

15

motivation to testify.  Cf. Olden v. Kentucky, 488 U.S. at 232, 109 S.Ct. at 483 (stating that speculation regarding prejudice caused by evidence of bias cannot justify exclusion of cross examination).

The Supreme Court has consistently "recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination."  Davis v. Alaska, 415 U.S. 308, 316-17, 94 S.Ct. 1105, 1110 (1974) (citing Greene v. McElroy, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413 (1959)); accord Olden v. Kentucky, 488 U.S. at 231, 109 S.Ct. at 483.  Additionally, this Court has made clear that the right to cross examination "is particularly important when the witness is critical to the prosecution's case." United States v. Mizell, 88 F.3d 288, 293 (5th Cir.), cert. denied, __ U.S. __, 117 S.Ct. 620 (1996).  Counsel should be allowed great latitude in cross examining a witness regarding his motivation or incentive to falsify testimony, and this is especially so when cross examining an accomplice or a person cooperating with the Government.  United States v. Hall, 653 F.2d 1002, 1008 (5th Cir. 1981).  Indeed, the right of cross examination:

> is so important that the defendant is allowed to "search" for a deal between the government and the witness, even if there is no hard evidence that such a deal exists. What tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists.

Id. (quoting United States v. Onori, 535 F.2d 938, 945 (5th Cir. 1976)).

Here, the jury was informed that Ottesen had pleaded guilty to two federal offenses and was awaiting sentencing.  The district

16

court's ruling nevertheless precluded the jury from learning of the pending state charge, which, especially in light of the plea agreement provision to relate Ottesen's cooperation to any other prosecuting authority, would allow the jury to conclude that "there was considerable incentive for him to `slant, unconsciously or otherwise, his testimony in favor of or against a party.'" United States v. Cooks, 52 F.3d 101, 104 (5th Cir. 1995).

In Cooks, the district court allowed cross examination of the prosecution witness regarding his status as a paid criminal informant and his hopes for leniency on certain charges pending in Texas in exchange for his assistance in the investigation. Id. at 103-04. However, the court disallowed cross examination regarding the witness's "subsequent Louisiana arrest for purse-snatching or . . . the stiff penalties [the witness] faced if convicted on either the Texas or Louisiana charges." Id. at 103. Noting that the pending Texas and Louisiana charges carried possible 99-year and 40-year sentences respectively, we recognized the obvious temptation to slant his testimony in favor of the prosecution. Cooks, 52 F.3d at 104 & n.13. We thus held that the district court erred in keeping from the jury these pertinent facts that related to the witness's motivation to testify.[15]

---

[15] Citing United States v. Hamilton, 48 F.3d 149 (5th Cir. 1995), the Government argues that the district court did not abuse its discretion in prohibiting the requested cross examination. Hamilton is inapposite. Unlike the case at bar, the pending charges against Hamilton were misdemeanor. Cf. United States v. Alexius, 76 F.3d 642, 646 (5th Cir. 1996) (distinguishing Hamilton on basis that it only involved state misdemeanor charges). More importantly, Hamilton was permitted to elicit evidence regarding the pending misdemeanor offenses during the cross examination of another witness.

17

In light of the fact that Ottesen's testimony was critical to the prosecution's case[16] and the pending charge carried the potential of a life sentence, we conclude that the district court erred in prohibiting the appellants from exploring before the jury the effect that Ottesen's pending criminal charge might have on his motivation to testify. Like the jury in <u>Cooks</u>, the jury in the instant case was unaware of the serious pending charge against Ottesen. And given the plea agreement provision that the Government, upon Ottesen's request, would advise any other prosecuting authority about the extent of Ottesen's cooperation in this case, the denial of cross examination and the defendant's right to have the jury properly assess Ottesen's motivation is even more egregious than in <u>Cooks</u>.

Next, we must determine whether this Confrontation Clause error was harmless. <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 106 S.Ct. 1431 (1986). "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." <u>Id</u>. at 673, 106 S.Ct. at 1438. We consider the following factors to determine whether the error was harmless: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the

---

[16] The Government does not (nor could it credibly) argue that Ottesen was not a crucial prosecution witness. During closing argument, the Government expressly referenced Ottesen's testimony at least 15 times. During defense counsel's argument, Ottesen was referred to as "the Government's star witness."

18

presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case." Id. After having extensively reviewed the record, we will consider the evidence in regard to each of the five appellants.

1.  ZEIGLER

It is abundantly clear that Ottesen's testimony was the most important in implicating Zeigler in the conspiracy. Ottesen testified that Zeigler was one of the five persons who were in charge of raising money and appeasing angry investors. Ottesen further testified that these five conspirators met several times a week and that Zeigler was aware that the companies were using in-house references. Ottesen described discussions he had with Zeigler regarding Cushman's falsifying drilling reports. No other witness's testimony comes close to implicating Zeigler to the extent that Ottesen's testimony does. Moreover, the prosecution's case against Zeigler was not strong. The vast majority of the prosecution witnesses neither spoke of nor implicated Zeigler in comparison to the few who testified against him.[17] We are confident that the error was not harmless beyond a reasonable doubt in regard to Zeigler's conviction.

2.  HANKS

---

[17]  As characterized by Zeigler's counsel during closing argument, "Mr. Ottesen . . . knows the Government's case against Mr. Zeigler is weak because if you were to take [the prosecutor's] references to Mr. Ottesen out of his opening, he wouldn't have had anything to say. He would not have been able to talk about Randall Zeigler."

Ottesen's testimony also implicated Hanks in the conspiracy. Ottesen testified that he spoke with Hanks regarding the use of in-house references for the company. He further testified that "we had Dave Hanks come in as an independent, [when] he was actually working for the company to appraise this rig and get the rig value over a million dollars, because that's what we were planning on raising." Although other witnesses testified regarding the value of the rig versus the appraisal amount, the other witnesses' testimony was not nearly as inculpatory.[18] We thus conclude that the error was not harmless.

3.  LANDERMAN

Similarly, Ottesen's testimony against Landerman appears significant, if not necessary, to the jury's verdict. Ottesen testified that Landerman "basically told [Cushman] how to set up the corporations to funnel the money through and things of that nature, and he tried to get the Hartford set up with a joint venture where we weren't security." He also testified that when Landerman first started coming to the Bedford office Landerman "would be standing up on the sales floor and cringe and tell people that you can't be saying that [to the potential investors]."

___

[18] In the context of arguing that there is sufficient evidence to sustain Hanks' conviction, the Government argues that "in addition to evidence of [his] participation in the drilling rig promotion,"
the following evidence demonstrates Hanks' involvement in the conspiracy: (1) Hanks was a sales manager at Hartford; he was used as an independent reference to investors; he lived in the apartment rented by Cushman and Holloman; he was paid by checks from Hartford Exploration or Hartford Energy; and he used the name of Ed Banks while at Hartford. It is clear that the evidence of the inflated drilling rig appraisal is the most inculpatory evidence against Hanks.

However, "[a]s time passed, [Landerman] got a little bit more lenient toward misrepresentations" and would just shake his head and laugh about any misrepresentations he overheard the sales brokers make. Landerman admitted to Ottesen that the money used to start Exciting Tans was funneled out of Hartford. Finally, Ottesen testified that Landerman was aware that they were using in-house references.

Other witnesses did testify that Landerman structured the financial transactions that form the basis of the two money laundering convictions. Of course, in order to constitute money laundering, the proceeds involved in the transactions must have been from the mail and wire fraud offenses, and the most damning testimony regarding Landerman's knowledge of the fraud came through Ottesen. We therefore cannot conclude that the error was harmless beyond a reasonable doubt.

4. HOLLOMAN

In regard to Holloman, Ottesen testified that, in Holloman's presence, Cushman stated that the Twin Elephant would not have any production and that he did not intend to spend any more money than had already been spent. Ottesen also asserted that Holloman was one of the five people "basically in charge of raising the money" and that this group of five met several times a week from December 1990 to December 1991.[19] Ottesen further testified that Holloman was involved in conversations regarding in-house references being

---

[19] Ottesen later backtracked somewhat, stating that, at the beginning, Holloman came to the office every day but later Holloman spent more time at the drilling site.

21

used in the company.

In contrast to Ottesen's testimony, a fair reading of the entire transcript leaves one with the impression that after the company was formed, Holloman spent virtually all his time at the well site attempting to drill for oil and gas. Indeed, even the Government witnesses testified that Holloman appeared competent while performing his duties at the well sites. Additionally, contrary to Ottesen's testimony, Landerman and Zeigler testified that they did not consider Holloman to be part of the management.

Ottesen's testimony regarding Holloman's knowledge of the use of in-house references may be viewed as somewhat cumulative of other witnesses' testimony. Nevertheless, after comparing Ottesen's testimony with the rest of the Government's evidence, we are not prepared to find this error harmless.

5.   CUSHMAN

Finally, we consider Ottesen's testimony against Cushman. Although there was sufficient evidence to convict Cushman without Ottesen's testimony, that is not the appropriate inquiry. As set forth above, Ottesen testified that Cushman stated he knew the Twin Elephant would not have any production and that he did not intend to spend any more money than had already been spent. Ottesen further testified that Cushman confessed "that the Twin Elephant wouldn't [amount to] a popcorn cart." Ottesen's testimony was, by far, the most damaging testimony against Cushman. This is the only testimony that we have found that directly shows that Cushman believed the oil and gas projects were simply a sham.

Further, closing arguments reveal the importance of Ottesen's

22

testimony against Cushman. The prosecutor relied heavily on Ottesen's testimony to set forth the case against Cushman. In response, Cushman's attorney argued that "the only witness that they really base all their case on is --what was that guy's name, the one that talked so fast and -- Ottesen." Although it is a close question, after a most careful reading of the record of this multi-week trial, we are not persuaded that the error was harmless beyond a reasonable doubt.[20] Therefore, the convictions of Zeigler, Hanks, Landerman, Holloman, and Cushman are vacated.

## C. RECUSAL

Cushman, Landerman, and Hanks argue that the district judge erred in refusing to recuse himself. They argue that the district court's actions and rulings favored the Government.[21] A judge should disqualify himself if a reasonable person, knowing all the relevant circumstances, would harbor doubts about the judge's

---

[20] It is worth noting that aside from Ottesen's testimony directly inculpating Cushman in the charged offenses, Ottesen provided other testimony that in general placed Cushman in a bad light before the jury: (1) Ottesen and Cushman used marijuana together on occasion; (2) Cushman purchased the Silver Fox lease in an attempt to curry favor with the next Securities and Exchange Commissioner; and (3) Ottesen observed "about $140,000 worth of cashier's checks made in $10,000 increments and a title to an Elante, a clear title to the Jaguar and a title to a Camaro" in a safe in Cushman's home.

[21] Landerman and Cushman both filed motions to recuse the judge in the district court based on the argument that the judge should have recused himself because he previously presided over a civil action filed by the SEC against the various companies that were the subject of this criminal case. Landerman filed an application for writ of mandamus with this Court, which was denied. The Government argues that because Hanks did not file such a motion, he has not preserved this argument for appeal. Because we find that this claim does not entitle the appellants to any relief, we do not reach whether Hanks preserved this issue for appeal.

23

impartiality.  Matter of Hipp, Inc., 5 F.3d 109, 116 (5th Cir. 1993).  We review the district court's denial of a recusal motion for abuse of discretion.  Id.

The appellants rely on appendices that list the district court's warnings to counsel and the times the court cut off questioning.  According to Cushman's appendix "C," the charts show, among other things, that the judge interrupted the defendants' attorneys 83% of the time and interrupted the Government 17% of the time.  They contend that the charts demonstrate that the court terminated defense counsel's questioning much more quickly than the Government's questioning.  By these actions, they argue, the judge conveyed to the jury an impression that he favored the Government's case.

"Judicial rulings alone almost never constitute valid basis for a bias or partiality motion."  Liteky v. United States, 510 U.S. 540, 114 S.Ct. 1147, 1157 (1994).  Instead, the judge's rulings should constitute grounds for appeal, not for recusal.  Id. Opinions formed by the judge that are based on the evidence in the case or events occurring during the proceedings do not constitute a basis for recusal "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.  Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Id.  If the remarks stem from an extrajudicial source, they may constitute sufficient grounds for recusal. Further, expressions of impatience, annoyance, dissatisfaction, and even anger, do not

24

establish bias or partiality.

The parties do not allege that Judge McBryde's alleged bias stemmed from any extrajudicial source. A careful review of the record indicates that Judge McBryde did allow the Government more leeway during its questioning and did interrupt defense counsel's questioning more often than the Government's questioning. Nevertheless, we are not convinced that the judge's remarks and actions were such that a reasonable person would harbor doubts about the judge's partiality. The district court therefore did not abuse its discretion in denying the motion to recuse.

D.    SUFFICIENCY OF THE EVIDENCE

Zeigler, Hanks and Landerman contend that the evidence is insufficient to support their convictions. When reviewing the sufficiency of the evidence, this Court views all evidence, whether circumstantial or direct, in the light most favorable to the Government with all reasonable inferences to be made in support of the jury's verdict. United States v. Salazar, 958 F.2d 1285, 1290-91 (5th Cir.), cert. denied, 506 U.S. 863, 113 S.Ct. 185 (1992). The evidence is sufficient to support a conviction if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Id. The evidence need not exclude every reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt, so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. United States v. Faulkner, 17 F.3d 745, 768 (5th Cir.), cert. denied, __ U.S. __, 115 S.Ct. 193 (1994).

25

To prove a violation of the mail fraud statute, 18 U.S.C. § 1341, the Government must prove beyond a reasonable doubt that there was (1) a scheme or artifice to defraud, (2) specific intent to commit fraud, and (3) use of the mails for the purpose of executing the scheme to defraud. United States v. Shively, 927 F.2d 804, 813-14 (5th Cir.), cert. denied, 501 U.S. 1209, 111 S.Ct. 2806 (1991). To prove a wire fraud offense under § 1343, there must be proof of (1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme. Id. at 813. After membership in a scheme to defraud is shown, a knowing participant is liable for any wire communication that has taken place or subsequently takes place in connection with the scheme. Id. To prove a money laundering offense under 18 U.S.C. § 1956(a)(1)(A)(i), the Government must demonstrate that the defendant: (1) conducted or attempted to conduct a financial transaction; (2) that the defendant knew involved proceeds of unlawful activity; (3) and did so with the intent to promote unlawful activity. See United States v. West, 22 F.3d 586, 590-91 (5th Cir.), cert. denied, __ U.S. __, 115 S.Ct. 584 (1994).

Finally, to prove a conspiracy, the Government must show that two or more persons agreed to commit a crime and that at least one of them committed an overt act in furtherance of that agreement. United States v. Tansley, 986 F.2d 880, 885 (5th Cir. 1993).

### 1. HANKS AND LANDERMAN

Hanks and Landerman contend that the evidence is insufficient to convict them because the only evidence linking them to any of the counts of conviction is the funds from the drilling rig deal.

26

They contend that because Horizontal Drilltex, the company involved in the rig deal, was dismissed from a prior SEC civil action, "res judicata principles preclude any finding that Horizontal Drilltex, Inc. funds were the proceeds of specified unlawful activity." We find no merit in this argument.

The appellants do not dispute that the judgment that dismissed Horizontal Drilltex from the previous suit provided that no violations of securities laws were admitted or denied. As such, it is clear that the issue of whether the proceeds from the rig deal were from unlawful activity was not litigated. The SEC action did not terminate with a final judgment on the merits, one of the requirements necessary for the application of res judicata. See United States v. Shanbaum, 10 F.3d 305, 310 (5th Cir. 1994).

Hanks and Landerman do not argue that the evidence is insufficient to sustain their convictions if the evidence regarding the drilling rig deal is included. In any event, viewing all the evidence in the light most favorable to the verdict, the evidence is sufficient to support the convictions of Hanks for conspiracy and wire fraud and Landerman for conspiracy and money laundering.

## 2. ZEIGLER

Zeigler contends there was insufficient evidence to support his convictions for conspiracy, mail fraud, and wire fraud. Zeigler acknowledges that Ottesen was the principal witness against him. Zeigler argues that "Ottesen's testimony should not be considered as support for [his] conviction where it is demonstrably false and concocted." We understand Zeigler's argument to be that Ottesen's testimony, if true, would be sufficient to sustain his

27

convictions, but because Ottesen's testimony is false, his convictions should not be sustained.

As set forth above, we must construe all reasonable inferences from the evidence in support of the verdict. More to the point, this Court is precluded from invading the province of the jury by substituting our credibility determinations for those of the jury unless the witness's testimony is factually impossible, which would render it incredible as a matter of law. United States v. Jaras, 86 F.3d 383, 388 (5th Cir. 1996). Zeigler has not shown that Ottesen's testimony is incredible as a matter of law. Accordingly, because the jury has the sole responsibility for determining the weight and credibility of the evidence, it could and apparently did credit the testimony of Ottesen. United States v. Harrison, 55 F.3d 163, 165 (5th Cir.), cert. denied, __ U.S.__, 116 S.Ct. 324 (1995).

Zeigler also argues that the evidence is insufficient because no evidence ever directly connected him with the victims of the four substantive mail and wire fraud counts. Zeigler, who had a management position in the company, ignores the fact that the charges levied against him in the indictment alleged that he aided and abetted the other defendants in regard to the substantive counts. 18 U.S.C. § 2.[22] Reading the record in the light most

_____

[22] To uphold a conviction for aiding and abetting under 18 U.S.C. § 2, the Government must prove that the defendant associated with a criminal venture, purposefully participated in the criminal activity, and sought by his actions to make the venture successful. United States v. Polk, 56 F.3d 613, 620 (5th Cir. 1995) (citations omitted). A defendant associates with the criminal venture if he shares in the criminal intent of the principal. United States v. Jaramillo, 42 F.3d 920, 923 (5th Cir.), cert. denied, __ U.S. __,

28

favorable to the verdict, the evidence is sufficient to support Zeigler's convictions for aiding and abetting his codefendants in the defrauding of the victims in the substantive mail and wire fraud convictions.

E.    DOUBLE JEOPARDY BASED ON RETRIAL

Cushman, Holloman, Landerman, and Hanks argue that the instant retrial was barred by the double jeopardy clause.  The district court granted the appellants' motion for a retrial based on an FBI Agent's conversation with a juror.

The general rule is that when a defendant moves for a mistrial there is no bar to retrying the defendant.  The Supreme Court has recognized a narrow exception to this rule.  In Oregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 2091 (1982), the Supreme Court held that only when the governmental conduct was intended to goad the defendant into moving for a mistrial may the defendant invoke the bar of double jeopardy after having requested the mistrial.  As the Government argues, the appellants have failed to allege (or point to anything in the record indicating) that the FBI agents engaged in the brief conversation with the juror intending to provoke the appellants into moving for a mistrial.  United States v. Botello, 991 F.2d 189, 192-93 (5th Cir. 1993), cert. denied, 510 U.S. 1074, 114 S.Ct. 886 (1994).  Therefore, this double jeopardy claim fails. Id.

F.    DOUBLE JEOPARDY BASED ON CRIMINAL CONTEMPT

_____

115 S.Ct. 2014 (1995).  A defendant participates in the criminal activity if he has acted in some affirmative manner designed to aid the venture.  Id.

29

Cushman argues that his double jeopardy rights were violated when he was tried on the indictment containing the criminal contempt charges. His argument is without merit.

The elements of the criminal contempt statute, 18 U.S.C. § 401(3) are: (1) a reasonably specific order; (2) violation of the order; and (3) the willful intent to violate the order. Cooper v. Texaco, 961 F.2d 71, 72 n.3 (5th Cir. 1992)). As the Government argues, these elements have no commonality with the elements of the conspiracy, mail fraud, wire fraud, and money laundering statutes.[23] Accordingly, because the same element test set forth in Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) is not violated, this claim is without merit.

III. CONCLUSION

In light of our disposition of the Sixth Amendment claim, we do not address the appellants' remaining claims except for Zeigler's argument that the district court erred in refusing to sever his case. We have determined that the district court did not abuse its discretion in denying Zeigler's motion for severance. See United States v. Williams, 809 F.2d 1072, 1085 (5th Cir.), cert. denied, 484 u.S. 896, 108 S.Ct. 228 (1987). Accordingly, we VACATE the convictions of Cushman, Holloman, Landerman, Hanks, and Zeigler and remand to the district court for further proceedings.

---

[23] The elements of these offenses previously have been set forth in this opinion.